**ALASKA PUBLIC EASEMENT DEFENSE FUND, an unincorporated association, Dale Bondurant, Tom Prunty, Darrell Farmen, Plaintiffs,**

v.

**Cecil ANDRUS, Secretary of the Interior, Curt Berklund, Director of the Bureau of Land Management, Department of the Interior, and Curtis McVee, Alaska Director of the Bureau of Land Management, Department of the Interior, Defendants.**

**CALISTA CORPORATION, Chugach Natives, Inc., Cook Inlet Region, Inc., Doyon, Limited, Koniag, Inc., Nana Regional Corporation, Inc., Alaska Federation of Natives, Inc., Plaintiffs,**

v.

**Cecil ANDRUS, Secretary of the Interior, Defendant,**

**State of Alaska, Defendant by Intervention.**

**SEALASKA CORPORATION, Plaintiff,**

v.

**SECRETARY OF the INTERIOR, Defendant,**

**State of Alaska, Defendant by Intervention.**

Civ. Nos. A75–204, A77–16, and A77–17.

United States District Court, D. Alaska.

July 7, 1977.

As Amended Aug. 19, 1977.

L. Mark Wine, Land and Natural Resources Div., Dept. of Justice, Washington, D. C., Donald J. Beighle, Juneau, Alaska, David Wolf, Keane, Harper, Pearlman & Copeland, Anchorage, Alaska, for plaintiffs Alaska Public Easement Defense Fund in A75–204 and for Calista Corp. et al. in 77–16 and Sealaska Corp. in 77–17.

James D. Sourant, Sourant & Strandberg, Henry J. Camarot, and Mark A. Sandberg, Merdes, Schaible, Staley & DeLisio, Robert M. Goldberg, Joe P. Josephson, Anchorage, Alaska, James Wickwire, Wickwire, Lewis, Goldmark & Dystel, Seattle, Wash., E. G. Burton, Burr, Pease & Kurtz, Inc., Ben J. Esch, Dickson, Evans & Esch, Robert Wagstaff, Wagstaff & Middleton, A. Robert Hahn, Jr., Hahn, Jewell & Stanfill, John Anthony Smith, Russell J. Gallagher, Gallagher, Cranston & Snow, Kenneth P. Eggers, Groh, Benkert & Walter, Anchorage, Alaska, J. P. Tangen, Robertson, Monagle, Eastaugh & Bradley, Juneau, Alaska, Peter R. Ellis, Ellis, Sund & Whittaker, Inc., Ketchikan, Alaska, James D. Linxwiler, John R. Snodgrass, Graham & James, Douglas B. Baily, Matthews, Dunn & Baily, Anchorage, Alaska, for Alaska Public Easement Defense Fund.

Michael M. Holmes, Falkner, Banfield, Doogan & Holmes, Juneau, Alaska, Thomas Meacham, Asst. Atty. Gen., State of Alaska, Anchorage, Alaska, Edward Weinberg, Duncan, Brown, Weinberg & Palmer, Arthur Lazarus, Jr., Fried, Frank, Harris, Shriver & Kampelman, Washington, D. C., Milton M. Souter, Kodiak, Alaska, Stan B. Stanfill, Hahn, Jewell & Stanfill, Anchorage, Alaska, Richmond F. Allen, Weissbrodt & Weissbrodt, Washington, D. C., for Calista Corp. et al. in 77–16 and for Sealaska Corp. in 77–17.

G. Kent Edwards, U. S. Atty., Dist. of Alaska, Anchorage, Alaska, for defendant.

## MEMORANDUM AND ORDER

von der HEYDT, Chief Judge.

These causes come before the court on various motions for summary judgment.[1]

1. Two of these cases, A77–16 and A77–17, were consolidated by the District Court for the District of Columbia prior to their transfer to this court. Those two cases were consolidated

The motions present to the court the issue of the scope of the authority of the Secretary of the Interior to reserve easements upon lands to be patented to Native corporations under the Alaska Native Claims Settlement Act,[2] 43 U.S.C. § 1601 *et seq.* (hereinafter ANCSA or Act).

The ANCSA was passed in 1971 to provide a fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims. 43 U.S.C. § 1601(a). The settlement provided the Natives with nearly one billion dollars and 40 million acres of land in Alaska. Under the Act the twelve Regional Corporations and a multitude of Village Corporations are given the right to select land from the public domain. 43 U.S.C. §§ 1611 and 1613(h). As part of this land selection and conveyancing process the Act provides that the Secretary of the Interior shall reserve public easements upon the lands selected prior to granting the patents. 43 U.S.C. § 1616(b)(3). It is the scope of this authority as well as the Secretary's authority to reserve easements pursuant to other Acts upon lands patented under the ANCSA which is questioned herein. The court first will consider the Secretary's authority to reserve easements under the ANCSA.

The entire easement selection process of the Act is contained in section 17(b). 43 U.S.C. § 1616(b). That section contains three subsections and the nature of the interplay among those subsections is a crucial question for decision. Subsection 17(b)(1) provides that:

> The Planning Commission shall identify public easements across lands selected by Village Corporations and the Regional Corporations and at periodic points along the courses of major waterways which are reasonably necessary to guarantee international treaty obligations, a full right of public use and access for recreation, hunting, transportation, utilities, docks, and such other public uses as the Plan-

ning Commission determines to be important.

43 U.S.C. § 1616(b)(1). The Planning Commission referred to in this subsection is the Joint Federal-State Land Use Planning Commission (hereinafter LUPC) established by subsection 17(a)(1), 43 U.S.C. § 1616(a)(1). The LUPC is composed of ten members, including the Governor of Alaska (or his designate), four members appointed by the Governor (one of whom must be an Alaska Native), one person appointed by the President with the advice and consent of the Senate, and four members appointed by the Secretary of the Interior. 43 U.S.C. §§ 1616(a)(1)(A) and (a)(1)(B). This Commission is given many functions under section 17 and clearly under subsection 17(b)(1) it is to identify public easements which fall within the specifically defined categories. This much is undisputed.

Subsection 17(b)(2) provides that:

> In identifying public easements the Planning Commission shall consult with appropriate State and Federal agencies, shall review proposed transportation plans, and shall receive and review statements and recommendations from interested organizations and individuals on the need for and proposed location of public easements: *Provided,* That any valid existing right recognized by this chapter shall continue to have whatever right of access as is now provided for under existing law and this subsection shall not operate in any way to diminish or limit such right of access.

43 U.S.C. § 1616(b)(2). This subsection establishes certain procedures for the LUPC to aid it in carrying out the function of identifying public easements. Also, by an important proviso, it ensures that in addition to the public easements reserved by the Secretary all other valid existing rights recognized by the Act will continue to have a right of access not limited by the subsection.

with A75–204 for the presentation of these motions which involve an issue of law common to all three cases. Rule 42(a), Fed.R.Civ.Pro.

2. For an excellent historical perspective of the Alaska Native Claims Settlement Act see *United States v. Atlantic Richfield Co.,* 435 F.Supp. 1009 (D. Alaska 1977).

The subsection which has created the difficulties culminating in these actions is 17(b)(3). It provides that:

> Prior to granting any patent under this chapter to the Village Corporation (sic) and Regional Corporations, the Secretary shall consult with the State and Planning Commission and shall reserve such public easements as he determines are necessary.

43 U.S.C. § 1616(b)(3). The parties to these cases take four positions on the scope of the authority of the Secretary under this subsection. The plaintiff in A77–16, the Calista Regional Corporation, contends that in reserving public easements pursuant to subsection 17(b)(3) that the Secretary is authorized only to choose from among those easements identified by the LUPC pursuant to subsection 17(b)(1). Calista is joined in this position by many of the Village Corporations. Sealaska Regional Corporation, plaintiff in A77–17, and several Village Corporations, assert the more moderate position that although the Secretary is not bound to select from the easements identified by the LUPC he is at least bound in his selections by the public easement criteria contained in subsection 17(b)(1). The Secretary takes the position that his power to reserve easements under subsection 17(b)(3) of the Act is totally independent of subsection 17(b)(1). According to his analysis he is not bound to select from the easements recommended by the LUPC nor to use the 17(b)(1) criteria in reserving easements. The Public Easement Defense Fund, plaintiff in A75–204, maintains that the Secretary is bound by the criteria contained in subsection 17(b)(1) and that one of those criterion, ". . . a full right of public use and access . . . ." has not been followed by the Secretary.

The question of the Secretary's authority became ripe for judicial review following the issuance of two orders published in the Federal Register. On February 12, 1976, the Secretary published Order No. 2982, dated February 5, 1976, which set forth guidelines applicable to the reservation of public easements under the Act.[3] Under section 5 of the order, the State Director of the Bureau of Land Management is authorized to reserve to the United States a continuous shoreline easement extending 25 feet above mean high tide along the marine coastline of the State. 41 Fed.Reg. 6295 (1976). The order further authorizes the reservation based upon present use, *inter alia*, of similar linear easements along both navigable and non-navigable rivers and streams.[4]

On March 18, 1976, the Secretary published in the Federal Register Order No. 2987, dated March 3, 1976, instructing the State Director, Bureau of Land Management, to reserve public easements to the United States in all conveyances made pursuant to the Act on mainland Alaska (except for an area in Southeast Alaska) for the transportation of energy fuel, and natural resources which are the property of the United States or which are intended for delivery to the United States or which are produced by the United States. 41 Fed.Reg. 11331 (1976).[5] By this order the State Director is authorized to determine the specific location of such public easements at an indefinite future date. As written, therefore, the order authorizes the reservation of so-called "floating easements" over most of the lands patented to Village and Regional Corporations.

Finally, in addition to the easements authorized under the orders, the Secretary has reserved in all interim conveyances, and apparently intends to continue to reserve in future patents, a right-of-way for ditches

3. In addition to the challenge to the substantive portions of this order it was initially alleged that the order was issued in violation of A.P.A. procedural rules, 5 U.S.C. § 553. However, pursuant to representations of counsel the court determined that the parties desired to waive this claim for relief and by the court's order of March 9, 1977, this claim, *inter alia*, was dismissed with prejudice.

4. Although section 5 of the order initially appears to reserve these easements on all land conveyed there are certain exceptions. See sections 5(c)(2) and 5(c)(3).

5. *See* note 3, *supra*.

and canals pursuant to 43 U.S.C. § 945, and a right-of-way for construction of railroads, telegraphs, and telephone lines pursuant to 43 U.S.C. § 975d. These last mentioned reservations will be considered at a later point in this memorandum.[6]

As an initial matter the court notes that jurisdiction in this matter is proper under 28 U.S.C. § 1331(a), and further that there is an actual case or controversy extant for which declaratory relief is an appropriate remedy. 28 U.S.C. § 2201.[7]

## I.

*Standard of Review*

■ The first legal issue which must be considered is what standard of review the court should apply to determine the issues presented. As will subsequently be developed there is a certain amount of ambiguity concerning the scope of the Secretary's authority to reserve public easements. At one point the Secretary contends that in such a situation his construction of the statute should be given great deference citing *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).[8] The Natives assert that the rule of construction which requires that "statutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians", *Bryan v. Itasca County*, 426 U.S. 373, 392, 96 S.Ct. 2102, 2113, 48 L.Ed.2d 710 (1976), should tip the balance in their favor. *See also Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89, 39 S.Ct. 40, 63 L.Ed. 138 (1918); *Squire v. Capoeman*, 351 U.S. 1, 6–7, 76 S.Ct. 611, 100 L.Ed. 883 (1956). In response to the Natives' argument the Secretary maintains that these groups are not dependent Indians but rather are well financed, profit making corporations. The court adopts, in part, the Natives' position on this point.

The rule of *Udall v. Tallman, supra,* is subject to many qualifications. It is, of course, settled that when this rule of construction is applicable the interpretation given by the Secretary is not controlling in any instance but is only accorded deference. *United States v. National Ass'n of Sec. Dealers,* 422 U.S. 694, 719, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975). This is but a part of the principle that it is the court, not the Secretary, which must ultimately construe the language used by Congress. *Zuber v. Allen,* 396 U.S. 168, 193, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969). In this case, additionally, the Secretary's interpretation is not "longstanding," *United States v. National Ass'n of Sec. Dealers, supra,* nor did the Secretary make known his views in Committee hearings, *Zuber v. Allen, supra,* nor does this case involve the interpretation of an administrative regulation. *Northern Ind. Pub. Serv. Co. v. Walton League,* 423 U.S. 12, 14, 96 S.Ct. 172, 46 L.Ed.2d 156 (1975).

To a certain extent the Natives' position has merit. While it is true that the Alaska Native Corporations are well financed that

---

**6.** *See* pages 680 to 681, *infra.*

**7.** The court notes that all parties urge that the issue of the scope of the Secretary's authority is ripe for judicial review as these orders represent the Secretary's final word on the issue and further factual developments are unnecessary. The court concurs in that belief and proceeds accordingly. *See generally* Davis, *Administrative Law Text*; § 21.01 *et seq.*

While some parties have requested review of specific easement reservations the court concludes that as to those easements there appear to be further administrative remedies. Moreover, such issues are inappropriate in the context of these motions which were to present only the legal issue of the scope of the Secretary's authority.

The court further notes that it does not intend to determine the entire validity of order 2982. The scope of this memorandum is limited to the validity of order 2987 and those portions of order 2982 which are specifically mentioned. The validity of the remaining portions of order 2982 are not ripe for adjudication at this time.

**8.** The Secretary also urges at one point that land grants are to be construed favorably to the government citing *United States v. Union Pacific Rwy. Co.,* 353 U.S. 112, 116, 77 S.Ct. 685, 1 L.Ed.2d 693 (1957). This argument is not forcefully made nor is its applicability developed in the context of the Act and the court does not consider it persuasive.

financing and the corporations themselves are the result of the Act. Prior to the Act Congress had the power totally to extinguish aboriginal land title without compensation. *United States v. Atlantic Richfield Co.*, 435 F.Supp. 1009, 1029–1030 (D. Alaska 1977); *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 279 & 285, 75 S.Ct. 313, 99 L.Ed. 314 (1955). Thus, although generally the Alaska Natives were not dependent in the sense that they were on reservations, their fate rested in the hands of Congress and they were dependent upon its protection and good faith. In these circumstances the language used, if ambiguous, should be resolved in their favor. *Squire v. Capoeman*, 351 U.S. 1, 6–7, 76 S.Ct. 611, 100 L.Ed. 883 (1956).

The court's approach, therefore, will be to analyze the statutory language and the legislative intent to determine these issues. If ambiguities remain they will be resolved in favor of the Natives.

*The Statutory Language*

[2] Contrary to the assertions of all parties the language of the statute is susceptible of all of the interpretations urged without violating any rules of statutory construction. It is necessary for a full understanding of the arguments, however, at this point briefly to trace the genesis of section 17(b).[9] During the period from 1969–1971 numerous bills were introduced in Congress concerning the settlement of the Alaska Natives' land claims. The bill which eventually passed the Senate was S. 35. S. 35, as amended, contained a section 24(d) which was quite similar to the present section 17(b). With some insignificant variation in wording subsections 24(d)(1) and 24(d)(2) of S. 35 were identical to subsections 17(b)(1) and 17(b)(2), respectively, of the Act. The major alteration occurred in subsection 24(d)(3) which provided in S. 35 that:

> Prior to granting any patent under this Act the Secretary shall consult with the Planning Commission *and shall reserve such public easements as the Planning Commission has identified and recommends.* (Emphasis added).

It is readily apparent that under S. 35 the relationship between the subsections was well defined. Under 24(d)(1) the LUPC would have identified public easements and under 24(d)(3) the Secretary would have been bound to reserve those easements which were recommended to him. There was no room for the exercise of discretion and the Secretary's duty was merely ministerial.

The House version of the Act, H.R. 10367, contained no language pertaining to easements or a Planning Commission. These two bills went to a Conference Committee which made major alterations and compromises in many areas. It was from this Conference Committee that the Act emerged with the present language regarding easements. *See* U.S.Code Cong. and Admin.News, 92nd Cong., First Sess., p. 2257 (1971). With this basic background the contentions concerning the statutory language become more clear.

In focusing on subsection 17(b)(3) the Secretary presents a plausible interpretation of the statutory language. That section, standing alone, appears to grant the Secretary the power to reserve easements without qualification except that such easements must be necessary. The Natives' contention, that such an interpretation reads subsection 17(b)(1) out of the Act, is without merit. Even if the Secretary is not bound by the LUPC identified easements or the 17(b)(1) criteria the LUPC would serve an important advisory role.

Nor is the Natives' assertion, that this construction would leave the Secretary with unfettered and, hence, unreviewable authority, well taken. While it is clear that such an interpretation would broaden the Secretary's authority over that asserted by the Natives the easement decisions would still be circumscribed by a statutory mandate of necessity. 43 U.S.C. § 1616(b)(3). While in the realm of judicial review of agency actions this limitation may be more theoretical than real, *see Tiger Inter., Inc.*

---

**9.** This material is considered in more depth in the Legislative History section, *infra.*

*v. C.A.B.,* 554 F.2d 926 at 933 (9th Cir. 1977), it does provide some basis for review. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

Similarly, the interpretations adopted by the Natives, which would bind the Secretary either to choose from the LUPC identified easements or compel easement selection based on the 17(b)(1) criteria are plausible. These interpretations look to the statutory language as a whole rather than an isolated section. Cf. *Train v. Colorado Public Interest Research Group,* 426 U.S. 1, 9–10, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976). Their central contention in this respect is that it is rather senseless to delineate specifically the types of easements which are appropriate for the LUPC to identify and then by a separate section give the Secretary the authority to disregard the easements identified by the LUPC and the criteria of 17(b)(1). This argument has some persuasiveness. It does seem to be a somewhat futile gesture to set forth carefully certain criteria and then have the eventual easement decisions be unfettered in any fashion by those criteria.

This construction does not re-establish the LUPC to the position it maintained under S. 35. Even the more radical position of Calista, which would bind the Secretary to choose from the LUPC identified easements would leave room for a choice not allowed under S. 35.

Nor would either Native position make meaningless, as the Secretary and State maintain, the Secretary's duty under 17(b)(3) to consult with the State prior to selecting easements. Again, assuming the more extreme position, this process would allow some State input in addition to its LUPC membership, prior to a final determination of which easements were to be reserved. Both of these positions are also supported by the rule of construction which would have the term "such" contained in 17(b)(3) refer back to the easements or the criteria contained in 17(b)(1). *Pohl v. State Highway Commission,* 431 S.W.2d 99, 105 (Mo.1968).

The precise position of the Public Easement Defense Fund on the issues seems to be that the Secretary is bound by the 17(b)(1) criteria. In this respect its interpretation based on the statutory language is on much the same footing as the Natives'. Having determined that the statutory language is capable of each of the several interpretations urged by the parties the court turns to the legislative history.

*Legislative History*

The development of section 17(b) has previously been traced. To summarize, this section originated as section 24(d) of S. 35. Under that bill the Secretary would have been required to reserve each easement identified and recommended by the LUPC. The House bill contained no easement provision. In a Conference Committee the language of S. 35 was changed to the language as it exists in the Act.

The portion of the legislative history which is most heavily relied on by the Natives is the Conference Committee Report. In discussing this provision the report states:

> Subsection 17(b) of the conference report is substantially the same as section 24(d) of the Senate amendment. This subsection provides for the advance reservation of easements and camping and recreation sites necessary for public access across lands granted to Village and Regional Corporations.

U.S.Code Cong. and Admin.News, 92nd Cong., First Sess., p. 2257 (1971). Indeed, this report, which states that the two sections are substantially the same can be read to support the positions taken by the Natives. As pointed out by the government, however, this section of the report must be taken in context. The Conference Committee met in the waning days of the Congressional session in an attempt to work out a compromise bill from two very different pieces of legislation. This legislation was seen as necessary to clear the way for construction of the trans-Alaska pipeline. Many of the changes made in conference were major and it would not strain creduli-

ty to conclude that even the Secretary's interpretation would have been considered substantially the same as S. 35 when compared with other changes that had been made. *See generally* Conference Report No. 92–746, *Introduction,* U.S.Code Cong. and Admin.News, 92nd Cong., First Sess., p. 2247 (1971).

Calista Corporation which takes the position that the Secretary is bound to choose from the easements identified by the LUPC makes on further argument concerning the Conference Committee compromise. It maintains that as S. 35 gave the Secretary no discretion to choose from the easements identified by the LUPC and that H.R. 10367 gave the Secretary no easement reservation power at all that a compromise could not have given the Secretary broad power. Of course, the court must agree that S. 35 gave the Secretary no discretion. Calista, however, reads too much into the silence of H.R. 10367. The legislative history of that bill indicates that the House was opposed to land use planning concepts in the framework of this legislation. House Report No. 92–523, *Committee Amendments,* U.S.Code Cong. and Admin.News, 92nd Cong., First Sess., p. 2200–01 (1971). Once the House conferees had agreed to the concept of land use planning in the Act it is not possible to ascertain what their views would be on the appropriate authority of the Secretary to reserve easements. It can just as easily be assumed that they would have granted unfettered discretion. In an analogous context the Supreme Court has stated that "the search for significance in the silence of Congress is too often the pursuit of a mirage." *Scripps-Howard Radio, Inc. v. FCC,* 316 U.S. 4, 11, 62 S.Ct. 875, 880, 86 L.Ed. 1229 (1942).

Juxtaposed to these portions of the legislative history, which can at best be considered generalized, are specific statements which forcefully undercut the position that the Secretary is bound by the LUPC identified easements. The Conference Committee Report states in two places that the LUPC is only an advisory body under the compromise legislation. One portion states:

A Joint Federal-State Land Use Planning Commission is established. The Planning Commission has no regulatory or enforcement functions, but has important advisory responsibilities.

Conference Report No. 92–746, U.S.Code Cong. and Admin.News, 92nd Cong., First Sess., p. 2249 (1971). At another point the Report states:

The Planning Commission has been modified by reducing the membership to ten members. In addition, the regulatory powers found in section 24 have been revised so that the Commission's functions are limited to providing advise (Sic), coordination and making recommendations to State and Federal government.

*Id.* at 2257. In addition to these statements of the Conference Committee one of the sponsors of S. 35, Senator Jackson, recognized the limitation placed on the LUPC and lamented this change. 117 Cong.Rec. 46967 (Dec. 14, 1971).

The term "advisory" normally indicates that the commission has no power to bind anyone. An "advisory committee" may make recommendations but the receiver of those recommendations is free to ignore that advice. *Harrington v. Tate,* 435 Pa. 176, 254 A.2d 622, 624 (1969); *McGraw v. Marion County Plan Commission,* 131 Ind. App. 686, 174 N.E.2d 757, 760 (1961). This definition is in accord with recently enacted Federal legislation. The Federal Advisory Committee Act, 5 U.S.C. App. I, states that in general all matters under consideration by an advisory committee should be determined, in accordance with law, by the official, agency, or officer involved. 5 U.S.C. App. I § 2(b)(6); *see also* 5 U.S.C. App. I § 9(b).

Recognizing the potential effect of this language, Calista, which adheres to the position that the Secretary must choose from the LUPC identified easements, contends that its interpretation of the Act would cast the LUPC in an advisory role. According to Calista the LUPC would just be giving the Secretary advice and he could then exercise his judgment and actually choose from the easements identified. Such a con-

struction, however, strains the meaning of the word "advisory". Under Calista's interpretation the LUPC would be regulatory to the extent that the Secretary could not go beyond its recommendation.

Given the uncertainty in the statutory language and the generalized nature of the legislative history supporting Calista's position, the court must conclude on the basis of these specific references that the Secretary is not bound to choose from the LUPC recommended easements. As the legislative history on this point is unambiguous there is no need to invoke the rule of construction which would resolve this issue in favor of the Natives.[10]

Of course, the preceding holding, and its rationale, have no effect upon the contention that the Secretary is bound by the public easement criteria contained in subsection 17(b)(1) as is urged principally by Sealaska and joined by the Easement Defense Fund. The quest for a resolution of this issue leads to the consideration of the purpose of the public easement section of the Act.

■ As previously mentioned the Act grants to the Alaska Natives 40 million acres of land in Alaska. The specific land which comprised the grant to eligible entities was not delineated. Rather the Village and Regional Corporations were to choose their land from the areas designated in conformity with the Act. In such circumstances Congress was justifiably concerned that certain portions of the State which were to remain in the public domain would become inaccessible, or landlocked by Native lands. It appears, therefore, that the public easements were to be reserved to provide access to the lands not selected, and they were not intended to provide the public with a right to use the Native lands for recreational activities. This construction of the Act is supported by its language and legislative history.

10. *See* pages 670 to 671, *supra.*

11. Whether this binds the Secretary in actually choosing easements is, of course, precisely the

Subsection 17(b)(1), in defining the scope of public easements, states that they are to be "across lands" which would indicate an easement for travel.[11] In addition to this language there is support for this construction in the legislative history.

S. 35, the Senate version of the Act, contained two easement provisions. Section 24(d), the predecessor to section 17(b), has already been discussed in detail and it used the term "across". The bill also contained a section 16(b) which, *inter alia,* provided the Secretary with the power to grant easements on lands withdrawn under that Act. In explaining this provision the committee stated it provided:

> [E]asements or rights-of-way for public purposes *upon* withdrawn lands only with the approval of the Commission and the giving of a commitment by the grantees to post bond and to conserve natural resources of the land.

S.Rep.No. 92–405, 92nd Cong., First Sess., 146 (1971) (emphasis added).

It thus appears that this section which created easements that the committee referred to as "upon" the land and which required a commitment to preserve natural resources was the section under which use of the Natives' land for recreation was to occur. The section was omitted from the Act.

In addition the public easement section was included as an integral part of the portion of the Act dealing with the LUPC. As the Senate explained, the principal function of the LUPC was to preserve and protect the public's interest in federal lands following enactment of the ANCSA:

> One of the most important problems facing the State of Alaska and the Federal Government in connection with the settlement of the land claims issue and gradual lifting of the administrative and Secretarial Order "land freeze" that has operated in Alaska over the past five years is to develop rational and coherent land use planning provisions which will

question under consideration and the court does not assume that conclusion.

operate to preserve the environment *and protect the public interest in Federal lands in Alaska. . . .*

S.Rep.No. 92–405, 92nd Cong., First Sess., 69 (1971) (emphasis added).

█ This statutory scheme in section 17 gave the LUPC the duty to plan and make recommendations concerning the public use of lands remaining in the public domain. *See* 43 U.S.C. §§ 1616(a)(7)(A), (a)(7)(E), and (a)(7)(I). While it was also to undertake some planning functions with respect to Native lands, *see* 43 U.S.C. §§ 1616(a)(7)(B) and (a)(7)(C), those functions did not relate to the *public* use of these lands. This is much the same function that the LUPC had under S. 35. Had that bill been enacted without the change in its subsection 24(d)(3) which has caused the present controversy there seems little doubt that the public easements identified and recommended by the LUPC would have had to have been to provide access to public lands.[12] Nothing in the changed role of the LUPC under the Act, the elimination of a recreational easement provision or the broader discretion granted the Secretary suggests that the appropriate purpose of the public easements was altered in any way.

█ With this overall purpose of public easements in mind the court turns to the issue of whether the Secretary is bound in his choices by the specific criteria found in subsection 17(b)(1). The court concludes that he is so bound.

In relegating the LUPC to an advisory role the Conference Committee maintained the criteria which defined the appropriate purposes of public easements. These criteria appear to express a Congressional intent to confine LUPC identified public easements to the specifically enumerated categories. These categories fully conform to the general legislative intent in allowing public easements. While an interpretation of the Act which would utilize these guide-

lines solely to define the role of the LUPC does not render the criteria meaningless it does certainly relegate them to a position of little consequence. The more logical inference is that these guidelines, which originally were adopted by the Senate as part of its land-use planning provision, continue to express the Congressional intent as to the purposes for and uses of public easements.

The result requested by the Secretary would, in reality, leave the Secretary with virtually unfettered discretion to reserve easements on the Natives' land. While, as previously pointed out, this discretion would be bounded and reviewable under a statutory mandate of "necessity", 43 U.S.C. § 1616(b)(3), such a limit would in fact be illusory when considered against the appropriate scope of judicial review of such agency decisions. *See generally Tiger Intern., Inc. v. Civil Aeronautics Bd.,* 554 F.2d 926 at 933 (9th Cir. 1977); Henke, *Judicial Review of Local Governmental Administrative Decisions in California,* 10 U.S.F.L.Rev. 361, 382–85 (1976). This result would potentially allow the Secretary to use this small subsection to negate substantial portions of the ANCSA. It seems unlikely that such an outcome was either anticipated or intended by Congress.

This construction is further supported although not dictated by three additional considerations. The Conference Committee Report on this section did state that it remained "substantially the same as section 24(d) of the Senate amendment." U.S.Code Cong. and Admin.News, 92nd Cong., First Sess., p. 2257 (1971). As previously developed [13] this language may not automatically eliminate the Secretary's proposed interpretation but it is certainly more supportive of that adopted herein. Secondly, the term "such public easements" contained in subsection 17(b)(3) can be interpreted to refer back to the types of public easements enumerated in subsection 17(b)(1). *Pohl v. State Highway Commission,* 431 S.W.2d 99,

---

**12.** This view is further confirmed by the legislative history of other ill-fated versions of the Act. As these bills did not pass, however, they are not considered persuasive.

**13.** *See* pages 672 to 673, *supra.*

105 (Mo.1968). Finally, this interpretation is supported by the standard of review previously considered. *Bryan v. Itasca County*, 426 U.S. 373, 392, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976).

*Section 19 Lands*

■ The final question under the legal issue of the scope of the Secretary's authority to reserve easements pursuant to section 17(b) concerns lands which were previously reservation lands. Section 19 of the Act, 43 U.S.C. § 1618, revoked most of those reservations and gave the Natives thereon the choice of accepting the benefits of other sections of the Act or taking the surface and subsurface estate in the lands which were previously reservation lands. It is contended that public easements under section 17(b) cannot be reserved upon any lands which were reservation lands prior to the Act.

The court notes at the outset that the Village Corporation raising this issue elected not to take the surface and subsurface title to its prior reservation but rather elected to receive the other benefits under the Act. Hence, the court does not consider the issue of the applicability of section 17(b) to lands which were formerly reserves and the Village chose to retain the surface and subsurface thereof pursuant to section 19(b). The question presented then is whether there may be public easements reserved on lands which are chosen by the Village under other sections of the Act but which formerly were reservation lands.

Section 19(a) of the Act revoked all prior reservations. With the possible exception of the lands not at issue here there is nothing in the Act which evinces an intent to treat these lands differently than other lands. The apparent intent as to Villages which chose to take their benefits under the Act, other than title to the surface and subsurface of their prior reservations, was to treat their lands in precisely the same manner as other land taken under the Act. The fact the section 19 does not mention section 17(b) is of no significance as none of the sections of the Act allowing land distribution refer to the easement section. *See e.g.* 43 U.S.C. § 1611.

Tyonek would have the court reach a different conclusion based upon the fact that subsection 17(b)(2) protects valid existing rights of access from impairment by the public easement section. It argues that at the time the ANCSA was enacted it had a valid existing right to the reservation land which may not be diminished by section 17(b). Subsection 17(b)(2), however, speaks only to dimunition or limitation on *access*. Assuming, *arguendo*, that these former reserves, which were expressly revoked by section 19, create rights under subsection 17(b)(2), the reservation of public easements does not diminish any prior rights of access.

As a second argument Tyonek urges essentially that there could be no valid public use of its reservation lands prior to the Act and as all public easements must be based on such use that none are allowed on these lands. As will be subsequently developed the court does not accept the contention that all easements must be reserved on the basis of valid pre-Act use and this argument must fail.[14]

## II

Having determined the scope of the Secretary's authority to reserve public easements the court turns its consideration to the Secretary's orders.

*Order 2982—Marine Coastline*

Order No. 2982 purports to reserve, ". . . a continuous linear easement 25 feet in width upland of and parallel to the mean high tide. . . ." Section 5(b)(2). In a subsequent section the order states that this easement will not be reserved if prior to conveyance it is determined to be impracticable for use by the general public. Section 5(c)(2)(A). This tentative reservation is challenged as being contrary to the statutory intent of section 17(b).

**14.** *See* page 678, *infra*.

■ Prior to proceeding to consider this issue directly it is necessary to present an overview of the ownership and control of various categories of waterways and the lands lying under those waterways in Alaska. Pursuant to the Alaska Statehood Act the Submerged Lands Act of 1953 applies to Alaska. 48 U.S.C. Prec. § 21, Sec. 6(m). The Submerged Lands Act confers to the States:

. . . title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters . . . .

43 U.S.C. § 1311(a)(1). The Act further states:

Nothing in this chapter shall be construed as affecting . . . the laws of the States which lie wholly or in part westward of the ninety-eighth meridian, relating to the ownership and control of ground and surface waters; and the control, appropriation, use, and distribution of such waters shall continue to be in accordance with the laws of such States.

43 U.S.C. § 1311(e). The court takes judicial notice of the fact that Alaska lies westward of the ninety-eighth meridian. Rule 201(b)(2), Fed.R.Evid. Thus, under federal law ownership and control of the land under navigable waters is confirmed in the State. *See also* A.S. § 44.03.020.

■ The ownership of ground and surface waters is to be determined according to State law. Under the Alaska Constitution and State law the right to use such waterways is placed in the people of the State. Alaska Const., Article VIII, Section 3; A.S. § 46.15.030.

Accordingly, the State owns or controls the land beneath navigable waters, and the people of the State have the right to use the water itself on non-navigable rivers and streams.

In apparent recognition of the fact that there would be valid public uses of the State's water, even when surrounded by lands withdrawn pursuant to the ANCSA [14a], the public easement provision states that easements shall be reserved "at periodic points along the courses of major waterways." The Natives assert the reservation of the continuous shoreline easement is not the reservation "at periodic points" and, hence, must be voided. This assertion is well taken.

■ The purpose of the easements along waterways is to provide a place for docks, campsites, and such facilities to service those who are properly using the public waters. This purpose is apparently accommodated by the reservation of site easements under section 5(b)(4) of the order.[15] By specifically stating that the reservation of easements along major waterways was to be "periodic" Congress clearly did not evince an intent to allow an easement of the type reserved here. Thus, this easement must be declared void. *United States v. Larionoff*, —— U.S. ——, ——, n. 12, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); *Dixon v. United States*, 381 U.S. 68, 74, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965); *Cf. Morton v. Ruiz*, 415 U.S. 199, 232, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974).

The court does not hold that a continuous easement along portions of the coastline may never be reserved. Such a reservation, however, must be necessary to provide public use and access to other public lands which may, of course, include the lands confirmed to the State pursuant to the Submerged Lands Act. The difficulty with the present reservation is that it exceeds those criteria. It includes among its purposes and criteria recreation, rather than access for

---

**14a.** The court notes that the issue of the ownership and control of the water column on waterways flowing through land taken by Natives pursuant to ANCSA is not before the court for decision at this time. Apparently that issue is presently being litigated elsewhere. Although the court's ruling on easements is dependent to a certain extent upon the under-

standing set forth in this memorandum that understanding was arrived at without the benefit of briefing on the issue and obviously constitutes merely background information and not rulings on the law.

**15.** The court does not decide the validity of this section but points to it only as illustrative.

recreation as provided in subsection 17(b)(1). It also states that this reservation is for travel along the shore but there is no showing of necessity as is required even by 17(b)(3).

*Recreational Rivers and Streams*

In another portion or order 2982 the Secretary has attempted to reserve a similar easement 25 feet in width along the banks of rivers and streams having highly significant present recreational use as well as an easement along the beds of those waterways. The reservation of this easement raises issues not present in the marine coastline reservation.

 The first issue is whether the term "major waterways" as used in the Act is the same as "major navigable waterways." If so this section would be extremely limited as a fair inference from the briefs is that there are only five major navigable waterways in Alaska. As previously developed the purpose of the easements at periodic points along major waterways is to provide docking and campsite easements for those using the public waterways. As the public has the right to use all of the waterways in the State it would be an unduly restrictive construction to equate the term waterways to navigable waterways when considered with the purpose of the subsection.

The next issue concerns the date which has been set for ascertaining "present recreational use." The Natives maintain that all such easements must be reserved on the basis of their use on the date the Act was passed. The Secretary has adopted a date of December 17, 1976, five years later. Because of the population growth and increased use of Alaska's waterways this is an issue of some significance.

It is claimed by the Natives that the Secretary has delayed distribution of land under the Act and then used his own delay to choose a date far beyond that contemplated by Congress. The Secretary asserts that this court cannot review this decision citing *Arizona Power Authority v. Morton*, 549 F.2d 1231, 1239–40 (9th Cir. 1977). *Arizona Power*, however, did not hold such

actions absolutely unreviewable and, indeed, stated that if clearly contradictory to legislative intent that such actions may be considered. Cf. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

 The public easement section itself contains no specific date which should be considered in reserving easements. The intent of the section, however, indicates that the date of enactment is not the appropriate date. This section was intended to preserve the right of public access to lands remaining in the public domain after Native selection. It is entirely possible that such lands may not have been used at all prior to December 18, 1976, and that it would still be appropriate to reserve an easement to them for future use. The date chosen by the Secretary is entirely consistent with the purpose of the section.

At various points in the course of the briefs the contention has been made that public easements can be reserved only on the basis of valid existing use. If such an interpretation were correct the argument on the present point and other related issues would be more compelling as the Secretary could not validate use by delaying conveyance. This contention finds its origins in subsection 17(b)(2) which protects access to valid existing uses.

 Subsection 17(b)(2), however, which protects access to valid existing uses appears to stand independently from the portions of the section which apply to the reservation of public easements. Its purpose is to ensure that those who have valid existing uses do not lose access rights because of the public easement section. It maintains prior access in spite of the public easement section rather than serving as a limit on the scope of public easements.

 With these two preliminary matters considered the court turns to the essence of the argument. The Natives contend here, similar to the coastline easement argument, that easements along the shores of these waterways may only be reserved at

periodic points. While the court reaches the same conclusion the footing is a bit more sure. As previously developed these types of easements are intended to provide camping and docking sites for those using the public waterways. With the coastline easement, however, the basis upon which future easements may rest and which was asserted as a reason to validate that portion of the order was in the access to State lands submerged along the coastline. Where necessary these easements may also be reserved along rivers and lakes constituting navigable waterways. As to the hundreds or thousands of other "major waterways," however, the State does not own the stream bed and such easements in aid of access are unnecessary.

Certainly, if these riverbank easements were intended merely to cross the Natives' land to reach other public lands they would be as valid as any other such easement. The order in this respect, however, reserves easements far in excess of those necessary for such access and is not predicated upon that need which appears to be an afterthought. *United States v. Larionoff,* —— U.S. ——, ——, n. 12, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); *Dixon v. United States,* 381 U.S. 68, 74, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965).

The Secretary offers absolutely no authority for the reservation of the beds of these waterways and there is no apparent justification for those reservations. Hence those easements may not be reserved.

The court has considered the other issues raised regarding this order and finds them not to be appropriate for summary judgment at this time.[16]

### Order 2987

Order 2987 was promulgated to establish easements for the transportation of fuel and natural resources. Apparently in recognition of the fact that it would be difficult to establish the precise location of such an easement without knowing the precise location of future mineral deposits this easement was not specifically located but rather was to be reserved in all patents. This creates a so-called "floating easement" which, if valid, will be specifically located when the necessity arises.

◼ The first attack on this easement is that the Secretary's authority to reserve a pipeline corridor was exhausted with the reservation of the trans-Alaska pipeline corridor pursuant to section 17(c), 43 U.S.C. § 1616(c). Under that section the Secretary was given the authority which later was exercised to reserve a pipeline corridor across Alaska. No land from the pipeline corridor was subject to Native selection. *Id.* The Natives contend that the Secretary may not now also reserve pipeline easements on Native land under the authority of section 17(b). Rather, they assert that if such a corridor is necessary in the future that the government should condemn the Natives' land and pay just compensation for the use. The court cannot accept this proposition.

It is true that the pipeline corridor reserved pursuant to section 17(c) exhausted the Secretary's authority under that section. All of the singular terms "the" and "a" appear to refer to that authority. The issue, however, is whether he may also reserve an easement for transportation of minerals under section 17(b). The criteria set out in subsection 17(b)(1) specifically refer to transportation. It is not in contravention of the language or purposes of section 17(b) to allow easements for the transportation of natural resources from public lands.

◼ The next consideration is whether such transportation easements must be specifically located. If section 17(b) had remained as it was in S. 35, section 24(d), this issue would be more certain. Under that section, as previously developed, the LUPC was to identify and recommend easements which the Secretary was required to re-

---

**16.** This includes the Easement Defense Fund's contention that insufficient weight has been given the phrase *full right of public access.* This matter involves factual determinations that are not appropriately considered at this time.

serve.[17] Under that scheme the LUPC was to "identify" easements. Subsection 24(d)(1). It was further stated that the LUPC was to receive input on the proposed "location" of public easements. Subsection 24(d)(2). This language indicates that the LUPC identified easements were to have a specific location and leaves little room for the argument that there were to be floating easements.

With the removal of the mandatory language from subsection 24(d)(3) in the final version of the Act the statutory language provides less guidance. The holding that the Secretary is bound by the LUPC criteria does not necessarily extend to this other language and, therefore, the court turns to different considerations.

The ANCSA was passed to give the Natives a fair and just settlement for their aboriginal land claims. 43 U.S.C. § 1601(a). In granting the Natives land it was assumed that the choices would be made on the basis of economic potential, *Aleut Corp. v. Arctic Slope Regional Corp.*, 421 F.Supp. 862, 866 (D.Alaska 1976); U.S.Code Cong. & Admin.News, 92nd Cong., First Sess., p. 2195 (1971). It seems rather certain from the general purpose of the Act that Congress did not envision the narrow purpose of section 17(b) as creating a cloud on the title and useability of all of the Natives' land.

The court can certainly understand the motivation of the Secretary in this instance. He is being asked to reserve a specific easement at this time for uncertain future use. Clearly it would be more convenient to reserve the floating easement but convenience is not the touchstone of his authority. The Secretary has not attempted to reserve other floating easements for future unknown public access for recreation and, indeed, he would be hard put to justify such a reservation. While the energy crisis of which the Secretary speaks may make the nature of the material travelling over the utility transportation easement unique, it does not alter the nature or requirements of the easement itself. Nothing in the Act

indicates that this easement should be treated differently than others and the overall intent of the Act strongly cuts against such an easement. Hence, this floating easement and order 2987 cannot stand. *Dixon v. United States*, 381 U.S. 68, 74, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965); *United States v. Larionoff*, —— U.S. ——, ——, n. 12, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977).

### III.

*Other Statutory Easements*

■ In addition to the previously considered orders the Secretary has reserved and indicates an intent to reserve in the future easements for ditches and canals pursuant to 43 U.S.C. § 945, and for railroads, telegraph and telephone lines pursuant to 43 U.S.C. § 975d. Those sections provide that;

> In all patents for lands taken up after August 30, 1890, under any of the land laws of the United States or on entries or claims validated by the Act of August 30, 1890, west of the one hundredth meridian, it shall be expressed that there is reserved from the lands in said patent described a right of way thereon for ditches or canals constructed by the authority of the United States.

43 U.S.C. § 945.

> In all patents for lands taken up, entered, or located in Alaska after March 12, 1914, there shall be expressed that there is reserved to the United States a right of way for the construction of railroads, telegraph and telephone lines

. . . . .

43 U.S.C. § 975d.

The Natives mount several direct attacks on the facial applicability of these two statutes. They contend that these lands were not taken up under any *land laws* of the United States as is necessary to trigger 43 U.S.C. § 945. As to both sections they assert that these land claims, resting on aboriginal rights, preceded the effective

17. *See* page 671, *supra*.

dates of both of these statutes. Finally they assert that these ANSCA conferred lands were not "taken up" within the meaning of these sections. While the court finds some merit in the first and last of these contentions it is not necessary to pass upon those issues.

The ANCSA contains a preemption section which states:

> To the extent that there is a conflict between any provision of this Act and any other Federal laws applicable to Alaska, the provisions of this Act shall govern.

Pub.L. 92–203, 85 Stat. 688, Section 26.[18] The easements reserved to the United States under the two non-ANCSA sections are floating easements. For the reasons previously developed the court concludes that such floating easements were not contemplated over ANCSA lands and these provisions must be considered as conflicting and inapplicable.

As a second related basis for this result the court notes that the criteria of subsection 17(b)(1) would appear to allow an easement for these purposes if it were specifically located. This specific right to reserve such easements must be seen as superceding the prior general legislation and would prevail even absent section 26. *Cf. State Department of Highways v. Crosby*, 410 P.2d 724, 728 (Alaska 1966). This conclusion is further bolstered by the fact that under ANCSA easements there are certain procedural safeguards not present in these other Acts. Accordingly, although reservations of specific easements for these purposes pursuant to subsection 17(b)(1) and 17(b)(3) might be appropriate these easements cannot stand.

*Certification*

While the memorandum and order and the simultaneously executed judgment entered hereon disposes fully of causes A77–16 and A77–17 it does not so dispose of A75–204. That complaint asserts other claims for relief and as factual issues remain as to this claim which cannot be determined in this memorandum it is not possible to enter a final judgment on this claim in accordance with Rule 54(b), Fed.R.Civ.Pro. In order to allow those entities who are parties to A75–204 to present their appeal at this time and as the court feels that this order involves a controlling question of law as to which there is a substantial ground for difference of opinion and an immediate appeal from this order may materially advance the termination of this litigation the court so certifies in accordance with 28 U.S.C. § 1292(b). Those parties to A75–204 who are not parties to the other actions who wish to appeal at this time should heed carefully the procedural differences between 28 U.S.C. § 1292(b) and the normal appeal process.

Accordingly IT IS ORDERED:

THAT the pending motions for summary judgment and partial summary judgment are granted and denied in conformity with this memorandum.

---

18. Apparently this section was not codified. *See* notes to 43 U.S.C. § 1601.