*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| RONALD J. SEATER, | ) | |
| | ) | Supreme Court No. S-17174 |
| Appellant, | ) | |
| | ) | Superior Court No. 3KN-10-00091 CI |
| v. | ) | |
| | ) | O P I N I O N |
| ESTATE OF FRED L. SEATER and | ) | |
| LEE N. SEATER, | ) | No. 7439 – April 10, 2020 |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District at Kenai, Carl Bauman and Jennifer K. Wells, Judges.

Appearances: Kristine A. Schmidt and Robert J. Molloy, Molloy Schmidt LLC, Kenai, for Appellant. Noah H. Mery, Gilman & Pevehouse, Kenai, for Appellees.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

BOLGER, Chief Justice.

## I.    INTRODUCTION

A landowner appeals a modification of a partition of land and subsequent related enforcement orders. We conclude that the landowner's appeal is untimely with respect to all but the most recent enforcement order. The most recent enforcement order

contained an erroneous interpretation of a term used in prior orders. We remand to the superior court to rectify that mistake.

## II.    FACTS AND PROCEEDINGS

In the 1940s Fred E.W. Seater and Clara Seater acquired a roughly five-acre parcel located along the Nikiski Bay beach in the Cook Inlet region, referred to as Lot 9. In 1956, following Fred E.W.'s death, Clara transferred Lot 9 to her sons Ronald Seater and Fred L. Seater, as tenants in common. Fred L. died in 1979. His widow, Lee Seater, as executor of his estate, conveyed his share in Lot 9 to herself. Ronald filed for partition of Lot 9 in January 2010.

In February 2012 the Kenai superior court issued a partition order severing Ronald and Lee's tenancy in common. The partition made a straight-line division in Lot 9 to create a northern "Lot 1" and a southern "Lot 2" of "reasonably equal 'value.' " Lee was granted the northern "Lot 1" and Ronald was granted the southern "Lot 2."

In April 2012 Ronald requested the use of an old access trail that crossed Lot 1. In October the superior court granted Ronald "an express appurtenant easement by necessity over Lot 1 for ingress and egress via the trail/road into the northern boundary of Lot 1."

In June 2014 Lee requested that "reciprocal easements for ingress and egress be established between Lot 1 and Lot 2." In September 2015 the superior court entered a decision granting Lee's request. The court stated that after "reviewing and balancing the equities and interests associated with the February 2012 Partition Decision, the private easement by necessity granted Lot 2 over Lot 1 in October 2012, and the practicalities and circumstances of the shifting sands of the beach, the tide, and the natural forces and impediments" impacting the lots it was granting Lee a "private diagonal cut easement over the northwest corner of Lot 2 . . . as a fair and equitable

request related to the partition in kind of Lot 9." The "diagonal cut" referenced by the court was a line marked by Lee's counsel on the blow-up of a previously proposed partition of the property.

The superior court specified that the diagonal-cut easement was subject to certain conditions, including that "the Lot 2 owner(s) may not block the diagonal cut with rip-rap, boulders, logs, tree root conglomerations, piling, sea walls, floating breakwaters, or otherwise *if* primarily intended to block access rather than protect against erosion." (Emphasis in original.) The court also noted that locating the exact "mean high water line" on both lots would be challenging and referenced boulders placed above the "mean high water line" on a neighboring property.

In July 2016 Lee moved to enforce the September 2015 decision. She alleged that Ronald was placing boulders on or around the easement to frustrate her access. Ronald claims that in response he "installed boulder fences . . . along a 10-foot wide corridor centered on the 'diagonal cut' on Lot 2, in order to mark the boundary between Lots 1 and 2; identify the location of the 'diagonal cut[';] deter trespassers (including the Lee Seater family); and prevent more erosion on Lot 2." The court initially denied Lee's request, and she moved for reconsideration.

In January 2017 the court ordered Ronald to "remove the boulders he placed, or directed to be placed, below the *high water line*, by no later than February 6, 2017." (Emphasis added.) The court sua sponte raised concerns regarding the obstruction of navigable waters by boulders placed "below the waterline" noting that "[a] person who intentionally places boulders below the mean high water line to prevent access creates a public nuisance."

In July 2017 Lee filed an enforcement motion alleging that Ronald continued to frustrate her access to the easement. Ronald responded that he was in

compliance with the court's January 2017 decision because all boulders on his property were above the mean high water line. The superior court held a hearing on Lee's request, after which it granted her motion to enforce. Ronald sought reconsideration and clarification of this decision, which the court granted.

In May 2018, after another hearing, the court issued another enforcement order.[1] This order defined the "high water line" — below which, per past decisions, Ronald was not permitted to place boulders — as "extreme high tide line," the maximum height reached by a naturally occurring high tide. The court rejected Ronald's contention that "high tide line" should be defined as "mean tide line." The court ordered Ronald to "remove all rocks on both sides of the easement path," including everything Lee marked for removal in an attachment to her August 2016 motion, "finding that [the rocks] are below the high tide line."

Ronald moved for reconsideration. Before the superior court ruled, Lee filed a third enforcement motion and requested expedited consideration. In July 2018 the court granted expedited consideration and authorized Lee to remove obstacles in the easement area and then seek reimbursement from Ronald.

On July 25, 2018, Ronald filed his notice of appeal of the May 2018 Order Regarding Boulder Removal and the July 20, 2018 Order on Defendants' Third Motion to Enforce.

## III.   STANDARD OF REVIEW

Ronald argues that the May 2018 order contained inaccurate interpretations of the September 2015 and January 2017 decisions. We typically review a superior

---

[1]     The May 2018 order was issued by Superior Court Judge Jennifer K. Wells. Prior relevant orders had been issued by Superior Court Judge Carl Bauman.

court's enforcement of its own order under an abuse of discretion standard.[2] But the May 2018 order is based on Judge Wells's interpretation of prior orders made by Judge Bauman. We review a superior court judge's interpretation of another superior court judge's order de novo, just as we would a judge's analysis of a similar written document, such as a contract or out-of-court custody agreement.[3]

Ronald also challenges the substance of the September 2015 and January 2017 decisions, effectively arguing that they were not final judgments and that he can

---

[2]     *See del Rosario v. Clare*, 378 P.3d 380, 383-84 (Alaska 2016)

(Although we have not specifically articulated a standard of review for this situation, enforcement of an order — reviewed for abuse of discretion — necessarily involves interpretation of that order, and we have previously explained the abuse-of-discretion standard for enforcement by pointing out that the court that entered the original order is in the best position to interpret its own order. Accordingly, we review the superior court's interpretation of its own order for abuse of discretion. (footnotes omitted)).

[3]     *See Crayton v. Crayton*, 944 P.2d 487, 489 n.1 (Alaska 1997) ("Although we 'generally review decisions on motions to modify child support for abuse of discretion,' the superior court's denial of Crayton's motion turns on the interpretation of [a settlement order not crafted by the superior court judge] and we therefore review it de novo." (quoting *Karpuleon v. Karpuleon*, 881 P.2d 318, 320 n. 3 (Alaska 1994))); *Gaston v. Gaston*, 954 P.2d 572, 574 (Alaska 1998) (writing that in the case of signed child custody agreements, "we review the superior court's interpretation of the agreement as we would review its interpretation of any other contract, de novo"); *Pennington v. Emp'r's Liab. Assur. Corp.*, 520 P.2d 96, 97 (Alaska 1974) (per curiam) (noting that an ambiguous judgment is "subject to construction according to the rules that apply to all written instruments"); *Miller v. Fowler*, 424 P.3d 306, 311 (Alaska 2018) (explaining we "review the superior court's interpretation of contract language de novo").

therefore include them in this appeal.  We exercise independent judgment to determine whether a superior court order has been properly appealed.[4]

## IV.  DISCUSSION

### A.  The 2015 And 2017 Decisions Are No Longer Subject To Appeal.

Ronald makes numerous arguments regarding the validity of the September 2015 decision granting Lee an easement and the January 2017 order enforcing it.  Ronald suggests these two decisions were not final judgments, allowing him to challenge both decisions in this appeal, which was filed more than 30 days after the superior court entered the orders.[5]  Before we consider the merits of his arguments, we must first determine whether the orders were final for purposes of appeal.

A final judgment "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."[6]  "[T]he reviewing court should look to the substance and effect, rather than form, of the rendering court's judgment, and focus

---

**4**     *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 204 P.3d 1023, 1026 (Alaska 2009) (noting that "[w]e exercise our independent judgment in interpreting court rules," including whether an appeal was properly filed) (citing *City of Kodiak v. Parish*, 986 P.2d 201, 202 (Alaska 1999)).

**5**     *See* Alaska R. App. P. 204 (requiring a party to appeal within 30 days of entry of final judgment).

**6**     *Wagner v. Wagner*, 205 P.3d 306, 310 (Alaska 2009) (quoting *Greater Anchorage Area Borough v. City of Anchorage*, 504 P.2d 1027, 1030 (Alaska 1972), *overruled on other grounds by City & Borough of Juneau v. Thibodeau,* 595 P.2d 626 (Alaska 1979)).

primarily on the operational or 'decretal' language therein" when determining whether a particular decision constitutes an appealable final judgment.[7] A superior court's order "has the force and effect of a final judgment or decree and is reviewable as such" when it "declare[s] the rights and legal relations of an interested party seeking the declaration, whether or not further relief is or could be sought."[8]

The September 2015 decision is a final judgment. The court framed the issue at hand as whether to grant Lee a reciprocal private easement, and then made a decision addressing that issue. Both parties had an opportunity to be heard and were represented by counsel. The court considered and rejected Ronald's arguments regarding a lack of jurisdiction and made detailed factual findings. Most importantly the court "conclud[ed] that the Lee Seater cross-motion for a private diagonal cut easement over the northwest corner of Lot 2 should be granted as a fair and equitable request related to the partition in kind of Lot 9." This decision on the easement "declare[d] the rights and legal relations" of Lee, the "interested party seeking the declaration."[9] Issuing this order left the court nothing to do but enforce the judgment, if future litigation made such enforcement necessary.

The January 2017 decision is also a final judgment. Ronald initiated the relevant litigation by filing a post-judgment challenge to the September 2015 order, and multiple motions and hearings followed. In January 2017 the court issued a "Decision on Pending Motions." The court made this decision after both parties had an opportunity

---

[7]     *Thibodeau*, 595 P.2d at 628 (quoting *Greater Anchorage Area Borough*, 504 P.2d at 1030-31).

[8]     AS 22.10.020(g).

[9]     *Thibodeau*, 595 P.2d at 628.

to be heard. The decision included factual findings and, most importantly, dispositive conclusions regarding the legal rights of both parties and the public. The court stated explicitly that its decision was a final ruling on Lee's motion to enforce. We conclude, based on the content of the decision and its legal impact, that it constituted a final judgment. Furthermore, Ronald's arguments regarding the invalidity of the January 2017 decision are based on the asserted invalidity of the September 2015 decision, which he did not properly appeal.

B. **We Review De Novo Superior Court Judge Wells's Interpretation Of Superior Court Judge Bauman's Order And Find A Mistake In The Definition Of "High Water Line."**

We review a superior court judge's interpretation of another superior court judge's order de novo.[10] Exercising independent review, we conclude that Judge Wells was mistaken in her assessment that Judge Bauman's January 2017 decision required Ronald to remove all boulders below the "high tide line as defined by [33 CFR Part 328.3(d)]" or, effectively, an extreme high water line.[11]

In her May 2018 order, Judge Wells noted that Judge Bauman had used inconsistent terminology in prior orders regarding the boulders, easement, and high water line. She then rejected Ronald's argument that Judge Bauman intended the area below, or seaward of, the median high water mark to be kept free of boulders. She determined

---

[10] *See supra* note 4 and accompanying text.

[11] Ronald also argues that Judge Wells erred and committed an abuse of discretion in entering the July 20, 2018 order allowing Lee to remove the boulders at Ronald's expense and requiring Ronald to show cause why he should not be held in contempt. However these remedies are specifically authorized by Alaska Civil Rules 70 and 90. We remand for further proceedings consistent with this opinion to clarify which boulders, if any, Ronald must remove. If, after the easement is defined, Ronald refuses to follow the superior court's orders, then such relief is clearly authorized.

that Judge Bauman intended to apply the definition of high tide used by the Army Corps of Engineers, which defines high tide line as the "maximum height reached by a rising tide," including high tides that occur with periodic frequency but excluding those associated with storm surges.[12]

There is a material difference between the average or mean high tide line and the extreme or maximum high tide line.[13] The extreme high tide line extends further shoreward than the mean high tide line.[14] Use of the terms high tide or high water without a qualifier such as extreme or average can cause confusion, especially in property and regulatory disputes.[15]

In the September 2015 and January 2017 decisions, Judge Bauman used the terms "high water line," "mean high water line," "at high tide," and "median high water mark" inconsistently. In multiple instances, he used adjectives synonymous with "average" when discussing the high water line. In the September 2015 decision, he noted that locating the "mean high water line" on both lots would be challenging and referenced boulders placed above that line on a neighboring property. In the January 2017 decision, he used or referenced the terms "mean high water line," "median high

---

[12]     33 C.F.R. § 328.3(d) (2019).

[13]     The Second Circuit has addressed this distinction, noting the material importance of distinguishing between statutes which confer jurisdiction on the Army Corps of Engineers up to the extreme high tide line and statutes which confer jurisdiction up to the mean high water line (the average point reached by high tides over 18.6 years). *United States v. Boccanfuso*, 882 F.2d 666, 668 (2d Cir. 1989).

[14]     *Id*.; *see also* NAT'L OCEANIC & ATMOSPHERIC ADMIN., *Tidal Datums*, https://tidesandcurrents.noaa.gov/datum_options.html (last visited Mar. 26, 2020).

[15]     *See Boccanfuso*, 882 F.2d at 668, 670-71.

water line," and "ordinary high water mark."[16]  At no point in either decision did Judge Bauman use the term extreme high tide or a similar term.  He did not indicate that he had considered and rejected the application of mean high tide in favor of extreme high tide or maximum high tide.  Nor did he reference 33 C.F.R. § 328.3(d), which provides the definition of high tide that Judge Wells associated with the Army Corps of Engineers.

In the January 2017 decision, Judge Bauman also raised the matter of public rights to navigable waters below the mean high water line.  He discussed the distinction between public rights and private rights, and expressed concern that boulders placed within the navigable waters would infringe on public access to the beach below the mean high water line.[17]  Judge Bauman's discussion of the public right of access to navigable

---

[16]     Judge Bauman also cited an Alaska Statute defining the "ordinary high water mark."  However, the term "ordinary high water mark" refers to shoreland, which is "defined by statute as 'land belonging to the state which is covered by nontidal water that is navigable . . . up to the ordinary high water mark as modified by accretion, erosion or reliction.' " *State, Dep't of Nat. Res. v. Alaska Riverways, Inc*., 232 P.3d 1203, 1206 n.3 (Alaska 2010) (citing AS 38.05.965(20) (2010)).  Shoreland, therefore, refers to areas of non-tidal waters, such as rivers and ponds, while the terms "mean high water mark" and "mean high water line" refer to tideland boundaries, with tideland defined as "land that is periodically covered by tidal water between the elevation of mean high water and mean low water."  *Id.* at n.6 (citing AS 38.05.965(23)).  We do not intend to muddy the distinction here.  Mean high water line is the appropriate term to use when discussing areas of tidal water such as those at issue in the present action.

[17]     Public right of access to navigable waters is well established.  "Under the public trust doctrine, the state holds title to the beds of navigable waters 'in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties.' " *Id.* at 1211 (quoting *CWC Fisheries, Inc. v. Bunker*, 755 P.2d 1115, 1117-18 (Alaska 1988)).  "Ownership of land bordering navigable or public water does not grant an exclusive right to the use of the water and a right of title to the land below the ordinary high water mark is subject to the rights of the people of the state to use and

(continued...)

waters includes multiple references to the fact that the mean high water line determines the boundary between public waters and private property.[18] His apparent intent was to protect public access rights by removing impediments and obstacles below the mean high water line.

At the close of the January 2017 decision, Judge Bauman wrote, "Ron Seater is ordered to remove the boulders he placed, or directed to be placed, below the high water line." We conclude that this order required Ronald to keep the beach clear of boulders below the mean high water line, but not below the extreme high water mark.[19]

---

[17] (...continued) have access to the water for recreational purposes or other public purposes for which the water is used or capable of being used consistent with the public trust." AS 38.05.126(c).

[18] The State has title to land underlying navigable waters up to the mean high water mark, and can regulate such waters to protect public access rights. *See Pankratz v. State, Dep't of Highways*, 652 P.2d 68, 73 (Alaska 1982) (first citing *State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363 (1977); then citing *Alaska Pub. Easement Defense Fund v. Andrus*, 435 F.Supp. 664 (D. Alaska 1977)). 11 Alaska Administrative Code (AAC) 53.900(14) (2020) defines mean high water as "the tidal datum plane of the average of all the high tides, as would be established by the National Geodetic Survey, at any place subject to tidal influence," and 11 AAC 53.900(15) defines mean high water line as "the intersection of the datum plane of mean high water with the shore." Federal law defines mean high water line as the average point reached by high tides over 18.6 years "established by survey with reference to the available tidal datum." 33 C.F.R. § 329.12(a)(2) (2019).

[19] Ronald argues that there are no boulders below the mean high tide line and that therefore, because the January 2017 decision used the term "median high water mark," he should not be required to remove any boulders. Ongoing proceedings regarding these orders demonstrate that the easement may benefit from a clearer and

(continued...)

## V. CONCLUSION

The superior court's 2018 decisions are VACATED. The case is REMANDED for further proceedings consistent with this opinion.

---

**19** (...continued)
more specific definition. The seaward boundary of the easement will change with the boundary of Lot 2; that is, the private interest will always be bounded by the mean high tide line. But it may be possible to more specifically define the shoreward boundaries of the easement, as required to promote Judge Bauman's original intent to provide reasonable access to Lot 1. Further definition of the boundaries of the easement will better effectuate the intent of the easement and give both parties and the court clarity for future compliance and enforcement.