### Steven HAKALA and George Kitchen, Appellants,

### v.

### ATXAM CORPORATION, Appellee.

### No. S–1866.

Supreme Court of Alaska.

April 22, 1988.

---

Thomas S. Gingras and Patrick G. Ross, Ross, Gingras, Bailey & Miner, Anchorage, for appellants.

Kneeland Taylor, Anchorage, for appellee.

Before MATTHEWS, C.J., RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

This appeal involves the statutory interpretation of the phrase "a primary place of business," as contained in § 14(c)(1) of the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1613(c)(1) (1986). Section 14(c)(1) requires a village corporation, upon receiving its interim conveyance of land from the federal government, to reconvey to the occupant any land used, as of December 18, 1971, as "a primary place of business." Since 1969, George Kitchen, later with help from Steven Hakala, guided brown bear hunts on the Canoe Bay lands to which Atxam, a village corporation, now has title. They frequently started and ended their hunts at one particular site, where they erected a small cabin. Kitchen and Hakala claim that, since the cabin and the surrounding lands were "a primary place of business," Atxam must reconvey title to them pursuant to § 14(c)(1). Kitchen and Hakala appeal the trial court's grant of summary judgment in favor of Atxam.

We conclude that Kitchen and Hakala's cabin site was "a primary place of business."

### I.

For at least the last 30 years, George Kitchen has made a living as an air taxi pilot and hunting guide. In the fall of 1967, Kitchen began professionally guiding in the Canoe Bay area of the Alaska Peninsula, roughly halfway between the Bering Sea and the Pacific Ocean. Kitchen and his clients hunt predominantly brown bear and some caribou in this area. In 1969, Kitchen erected a prefabricated metal structure on the Canoe Bay site to serve as the base camp for his bear hunting operations. In his deposition, Kitchen described it as ten feet by twelve feet, "a garage type deal made out of more of a plastic than metal," with no windows. After bears and strong winds tore down the structure, Kitchen re-erected similar prefabricated metal structures in 1970 and again in 1971 or 1972.

In 1974, Kitchen and Steven Hakala, a stepson, built a permanent structure made of plywood to serve as the base camp for the guiding operations.[1] The cabin is a one-room structure, 16 by 20 feet in dimension and contains an oil stove for heat, a cooking stove, five bunks, electric lights and various other pieces of furniture. An outhouse, also built in 1974, stands approximately 20 yards from the cabin. A bush airstrip which Kitchen uses when he flies in customers and supplies, is also located near the cabin.

Kitchen holds a guiding license which he obtained in 1958, and an exclusive area permit which he obtained in 1973 when the State of Alaska first allocated such permits. The exclusive area permit grants Kitchen exclusive rights to guide paying customers in the exclusive area of approximately 400 square miles.[2] In addition to his guiding operations in the Canoe Bay area, Kitchen also ran an air taxi business

---

1. Although this cabin was not built until 1974, more than two years after the pertinent date specified in § 14(c)(1), the cabin and the surrounding facilities are relevant to the curtilage issue.

2. Evidently, Alaska residents could freely hunt in the same area, so long as they did not use a guide.

in the early 1970s and guided out of Teller, Kotzebue, and in the Wrangell and Talkeetna Mountains.

Kitchen's guiding operations in the Canoe Bay area have typically proceeded as follows: Kitchen takes a maximum of six clients at a time and all necessary supplies into the cabin in the Canoe Bay area, by making several trips back and forth by plane. Although the majority of the time he uses the Canoe Bay cabin as the base camp, Kitchen occasionally uses a cabin at Minos Creek—about twenty miles away— as the base camp. From the base camp, Kitchen guides the group of hunters in the wilderness areas surrounding the base camp, setting up smaller "spike camps" wherever brown bears are spotted. Kitchen's strategy is to hunt wherever the hunting is good.

Brown bear season was limited to a two-week period of time in May and a two-week period of time in October.[3] As a result, Kitchen's use of the cabin and its environs was limited to these two-week periods of time with a couple of days added both before and after the two-week seasons to prepare for and clean up after the hunt.

Kitchen charged each hunter $4,000 for his guiding services in Canoe Bay in 1971. This price had risen to $7,000 per hunter by 1987, of which Kitchen profits $1,800 per hunter after expenses. Beginning in 1975, Hakala served as an assistant guide to Kitchen, aiding him in the guiding operations out of Canoe Bay. Kitchen and Hakala have an existing agreement that Hakala will take over Kitchen's guiding operations when Kitchen, presently 72 years of age, retires.

Atxam Corporation is a Village Corporation. The United States government conveyed title to 12,500 acres in the Canoe Bay area to Atxam by Interim Conveyance No. 159 pursuant to § 14(a)(1) of ANCSA. The interim conveyance is subject to a number of exceptions and easements. Kitchen's cabin is located on land described in the interim conveyance, to which Atxam presently has title. Accordingly, Atxam sued Kitchen and Hakala in superior court claiming that Kitchen and Hakala have committed and continue to commit a trespass by erecting a cabin on Atxam's property and by leading hunting expeditions on Atxam's lands. Atxam sought a permanent injunction against future trespasses, possession of the property and money damages. Kitchen and Hakala claim that they are entitled to have the area upon which the cabin is situated and the hunting areas they use in their guiding operations reconveyed to them under § 14(c)(1) of ANCSA.

After filing its complaint in the Superior Court, Third Judicial District, Atxam moved for partial summary judgment. The superior court granted Atxam's motion for partial summary judgment, ordered Kitchen and Hakala to give possession of the cabin to Atxam, extinguished any claim that Kitchen and Hakala had to the lands described in the interim conveyance, and enjoined Kitchen and Hakala from entering upon or hunting on the land described in the interim conveyance. Atxam then moved the court to dismiss its claim for a money judgment for past trespasses and for entry of final judgment based on the court's prior partial summary judgment order. The superior court granted Atxam's motion and entered final judgment consistent with the summary judgment order. Kitchen and Hakala appeal from the superior court's grant of partial summary judgment.

## II.

The primary issue in this appeal concerns how the court should interpret the phrase "a primary place of business" as contained in § 14(c)(1) of ANCSA. In defending themselves against Atxam's trespass claim, Kitchen and Hakala claim that they are entitled to have certain portions of Atxam's land, which they have used as "a primary place of business," reconveyed to them pursuant to § 14(c)(1) of ANCSA. Atxam's interim conveyance explicitly states that it is subject to the reconveyance clause in

---

**3.** Under the regulations, after an October hunt, there evidently is an 18-month period of time before the next hunt is allowed in the same game management unit.

§ 14(c) of ANCSA which reads in pertinent part as follows:

> Each patent issued pursuant to subsections (a) and (b) of this section shall be subject to the requirements of this subsection. Upon receipt of a patent or patents:
>
> > (1) the Village Corporation shall first convey to any Native or non-Native occupant, without consideration, title to the surface estate in the tract *occupied as of December 18, 1971 ...* as a primary place of residence, or as *a primary place of business,* or as a subsistence campsite, or as headquarters for reindeer husbandry;
> >
> > . . . .

(Emphasis added.) 43 U.S.C. § 1613(c)(1).

To date, no case has interpreted § 14(c)(1), and the legislative history of the Act provides no insight into this particular section. Both sides have provided the court with their interpretations of the phrase "a primary place of business," neither of which wholly lacks merit.

The first step in interpreting an ambiguous phrase in a statute is to "construe[ ] [it] in light of the purpose of the enactment." *Commercial Fisheries Entry Comm'n v. Apokedak,* 680 P.2d 486, 489–90 (Alaska 1984). Another rule of construction instructs the court to give effect to the plain meaning of the language. *Wilson v. Municipality of Anchorage,* 669 P.2d 569, 571–72 (Alaska 1983).

In the introductory section of ANCSA entitled "Congressional findings and declaration of policy," Congress sets out the purposes of the Act:

> Congress finds and declares that—
>
> (a) there is an immediate need for a fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims;
>
> (b) the settlement should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives, without litigation, with maximum participation by Natives in decisions affecting their rights and property, . . . .

43 U.S.C. § 1601. In ANCSA, Congress reiterated the United States' policy of giving Native tribes "title to a portion of the lands which they occupied." House Comm. on Interior and Insular Affairs, Alaska Native Claims Settlement Act of 1971, H.R. Rep. No. 523, 92d Cong., 1st Sess., *reprinted in* 1971 U.S.Code Cong. & Admin.News 2192, 2193. Furthermore, Congress was sensitive to the impoverished condition of Natives and the lack of opportunity Natives have to improve their condition. *Id.* at 2196. Courts have adopted the policy of construing ambiguities in ANCSA in favor of Natives. *United States v. Atlantic Richfield Co.,* 612 F.2d 1132, 1138–39 (9th Cir.1980); *Alaska Public Easement Defense Fund v. Andrus,* 435 F.Supp. 664, 670 (D.Alaska 1977).

We do not, however, believe that Congress intended under ANCSA to convey lands to native corporations to the exclusion of those who had previously utilized the lands in an established, legal and routine fashion. Otherwise, we can find no reason for Congress to have included the reconveyance clause in § 14(c)(1). Thus, we believe that in § 14(c)(1), Congress intended to protect the existing rights of those using lands which would later become subject to an interim conveyance under ANCSA. Accordingly, we adopt an interpretation of the phrase "a primary place of business" which effectuates Congress' intent to protect a wide array of existing legitimate businesses.

Kitchen and Hakala urge the court to adopt a common-sensical interpretation of "a primary place of business." In essence, Kitchen and Hakala argue that since the cabin site served as the base camp of their guiding operations, the cabin site must have been Kitchen's "primary place of business" on the relevant date, December 18, 1971.

Kitchen and Hakala argue that it is significant that Congress chose to use the indefinite article "a" instead of the definite article "the" to precede "primary place of business" in § 14(c)(1) of ANCSA. Kitchen and Hakala argue that in utilizing the article "a" Congress must have meant "that the primary place of business in question

**1148**

does not have to be the *the only* place of business of an individual." (Emphasis in original.) *See Brooks v. Zabka,* 168 Colo. 265, 450 P.2d 653, 655 (1969) ("the definite article 'the' particularizes the subject which it precedes ... [and] is a word of limitation as opposed to the indefinite or generalizing force of 'a' ").

■ Kitchen and Hakala's argument requires further development. We recognize that a person can engage in more than one type of business. In fact, Alaskan residents, known for their independent and often untraditional ways of life, often do not engage in just one type of business. Instead, many Alaskans make a living from several different businesses such as fishing, hunting, guiding or some combination of these and other activities. We find that for each business in which a person engages, there can be only *one* primary place of business.[4] The primary place of any business is that place which serves as the center of activity for that business.

We turn now to Atxam's proposed interpretation of a "primary place of business" which is more quantitative than Kitchen and Hakala's. Atxam suggests the fulfillment of three requirements for a finding of "a primary place of business." First, Atxam would require that the place of business be *improved* and not an "undeveloped piece of raw wilderness." Second, Atxam would require some kind of permanent structure. Third, Atxam would require that the place be used at least six months out of the year for business. Atxam's definition goes too far. A set of rigid and arbitrary requirements would only serve to defeat Congress' intent of protecting the valid and existing rights of those previously using the lands in question.

In interpreting the phrase "a primary place of business," we are particularly

mindful of the statutory context in which that phrase appears. Most of the lands subject to conveyance under ANCSA are remote lands, outside the confines of cities, towns and villages. In drafting § 14(c)(1), Congress must have had in mind those particular lands, and the nature of the particular businesses that are ordinarily conducted on those lands. Much of that business is seasonal, and involves the use of structures that can hardly be considered permanent.[5] Atxam's proposed requirements of a permanent structure and six months' occupancy simply are not consonant with the realities of the businesses that Congress must have had in mind— namely, businesses conducted on rural or remote lands.[6] We are unwilling to adopt such a restrictive definition.

■ Since the facts in this case are undisputed, summary judgment is a proper procedure with which to resolve this case.[7] *See* Alaska R.Civ.P. 56(c). However, we believe that the undisputed facts dictate a result contrary to the result arrived at by the trial court. The facts indicate that Kitchen used the cabin and the immediate, surrounding area as the base for his brown bear guiding operations. Kitchen was a registered guide and had a state license to hunt in the area. He has guided out of the Canoe Bay area and, in particular, out of the cabin site in question, since 1969. Before Atxam received title to the lands, Kitchen legally operated his business out of the area. It seems clear to us that the reconveyance clause in ANCSA sought to protect existing uses of land such as Kitchen's. Since the cabin was the nucleus of his guiding business, we conclude that it was a primary place of business.

■ We hold that, pursuant to § 14(c)(1), Atxam must reconvey the site of the cabin

4. Black's dictionary defines the word "primary" as "[f]irst; principal; chief; leading. First in order of time, or development, or in intention." *Black's Law Dictionary* 1071 (5th ed. 1979). In essence, this definition states that there can only be one "primary" anything.

5. A common example is the commercial fishing camp where commercial fishermen live in large tents during the short fishing season.

6. We neither agree nor disagree with Atxam's proposed requirement that a primary place of business be improved, as opposed to raw wilderness. The site under dispute in this case *was* improved.

7. This court gives *de novo* review to appeals from grants of summary judgment by the superior court. *State v. Jennings,* 555 P.2d 248, 250 (Alaska 1976).

and curtilage to Kitchen because it was "a primary place of business" in 1971. We remand to the trial court to determine the size of the curtilage; that is, a reasonable area surrounding the cabin which Kitchen needs so that he can use the cabin as his own.[8] Additionally, Kitchen and Hakala are allowed to use the public easements, namely the coastline easement and the bush airstrip easement, contained in the interim conveyance to the same extent as the public.[9] However, we do not authorize Kitchen or Hakala to hunt on any of Atxam's lands which are not in the designated curtilage or subject to the public easements without first getting permission from Atxam. To this extent, we affirm the trial court's injunction, which enjoins Kitchen and Hakala from entering upon, crossing over or hunting on Atxam's lands, as an appropriate remedy for a continuing trespass. *See Sundquist v. Halloran*, 5 Alaska 594, 600 (D.Alaska 1917) (legal remedy of money damages is inadequate and issuance of injunction proper in continuing trespass action due to the necessity of a multiplicity of suits).

The judgment of the superior court is REVERSED and this case is REMANDED for further proceedings consistent with this opinion.

RABINOWITZ, Justice, dissenting.

I agree with the majority's acknowledgement that ANCSA was intended to benefit Natives, and that courts, to that end, have adopted the policy of construing ambiguities in favor of Natives. For that reason I cannot agree with the majority's expansive interpretation of "a primary place of business," which requires reconveyance of Native lands "to protect a wide array of existing ... businesses."

Furthermore, even assuming *arguendo* that the majority's interpretation of "a primary place of business" as "that place which serves as the center of activity for [a] business" comports with Congress' intent, it does not support the result reached in this case. Although Hakala may have had separate primary places of business for his guiding and air taxi businesses, the cabin at issue here was not the primary place of business for his guiding business. In 1971, the determinative year for purposes of reconveyance, Hakala guided twenty parties. Only two of those twenty parties were guided out of the Canoe Bay cabin. I fail to see how a cabin that served as a base for only one-tenth of the activities of Hakala's guiding business can be "the center of activity for that business" or the "nucleus of his guiding business" for purposes of Section 14(c)(1). I therefore dissent.

---

**8.** We do not accept Kitchen and Hakala's argument in their brief that the curtilage consists of "access rights to the entire area and reconveyance of the acreage actually utilized by [Kitchen] in conjunction with his guiding operation." Instead, in determining the size of the curtilage, the trial court should apply the traditional definition of curtilage:

A piece of ground commonly used with the dwelling house. A small piece of land, not necessarily inclosed, around the dwelling house, and generally includes the buildings used for domestic purposes in the conduct of family affairs. A courtyard or the space of ground adjoining the dwelling house necessary and convenient and habitually used for family purposes and the carrying on of domestic employments. A piece of ground within the common inclosure belonging to a dwelling house, and enjoyed with it, for its more convenient occupation.

*Black's Law Dictionary* 346 (5th ed. 1979).

**9.** The United States Supreme Court has not definitively determined the extent to which the public can use a public easement created pursuant to § 17(b) of ANCSA. In 1977, a federal district court stated that it appeared from ANCSA that "the public easements were to be reserved to provide access to the lands not selected, and they were not intended to provide the public with a right to use Native lands for recreational lands." *Alaska Public Easement Defense Fund v. Andrus*, 435 F.Supp. 664, 674 (D.Alaska 1977). However, in 1979, the Secretary of the Interior obviously had another view. In Interim Conveyance No. 159, the Secretary created a coastline easement "in order to provide access to and along the marine coastline and use of shore for purposes such as beaching of watercraft or aircraft, travel along the shore, recreation and other similar uses."