**CITY OF KETCHIKAN, a municipal corporation, d/b/a Ketchikan Public Utilities, Plaintiff–Appellant,**

v.

**CAPE FOX CORPORATION, an Alaska corporation, Defendant–Appellee.**

**No. 94–35316.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 10, 1995.

Decided Sept. 6, 1995.

H. Clay Keene, Keene & Currall, Ketchikan, AK, for plaintiff-appellant.

James D. Nelson, Lori L. Guzzo and Robert F. Lopez, Betts, Patterson & Mines, Seattle, WA, for defendant-appellee.

Before: WRIGHT, POOLE, and WIGGINS, Circuit Judges.

WIGGINS, Circuit Judge:

## OVERVIEW

■ The City of Ketchikan ("the City" or "Appellant") appeals a District Court order granting Cape Fox Corporation's ("Cape Fox") motion for summary judgment. The City sought conveyance from Cape Fox of fee title to 38 acres upon which the City's Beaver Falls hydroelectric powerhouse is located. The district court ruled that the City was not entitled to the land under the Alaska Native Claims Settlement Act ("ANCSA" or "the Act") because the land did not qualify as a "primary place of business," 43 U.S.C. § 1613(c)(1), and the City's utility did not qualify as a "nonprofit organization," 43 U.S.C. § 1613(c)(2). The City appeals the grant of summary judgment. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review *de novo* the grant of summary judgment, *Jesinger v. Nevada Fed. Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994), and we affirm.

## BACKGROUND

Ketchikan Public Utilities ("KPU"), a nonprofit organization of the City of Ketchikan, operates electric, water, and telecommunications utilities. As part of its electric utility, it operates the Beaver Falls hydroelectric powerhouse approximately six miles outside of Ketchikan. The City constructed the facility in 1945 and has operated it since then under a 50–year licence from the Federal Power Commission.

In 1971 Congress enacted ANCSA. The Act was a legislative compromise written in response to conflicts between the federal government, the state of Alaska, Alaska Natives, and non-Native settlers over the ownership of Alaskan lands.[1] In 1984 Cape Fox,

---

1. Under the Act, Alaska was divided into twelve geographic regions. In each region a Native

Regional Corporation was established. In addition, approximately 200 Village Corporations

a Native Village Corporation, acquired title to 428 acres of federal land pursuant to ANCSA. The Beaver Falls powerhouse is situated upon approximately 38 acres of that land. The City seeks reconveyance of the powerhouse site pursuant to two sections of ANCSA. It argues that the Beaver Falls site is a primary place of KPU's electricity utility business pursuant to 43 U.S.C. § 1613(c)(1), and that KPU is entitled to the land as a nonprofit organization under subsection (c)(2). The district court granted Cape Fox's motion for summary judgment on October 13, 1993, finding neither reconveyance provision applicable. It then reaffirmed its judgment on January 18, 1994, based on slightly different reasoning. The City appeals from that order.

## DISCUSSION

I. *The Site Is Not a "Primary Place of Business" Under 43 U.S.C. § 1613(c)(1).*

■ The City first argues that it is entitled to a reconveyance of the disputed site under 43 U.S.C. § 1613(c)(1), which provides:

the Village Corporation shall first convey to any Native or non-Native occupant, without consideration, title to the surface estate in the tract occupied as of December 18, 1971 ... as a primary place of business....

We disagree. We do not believe that the Beaver Falls powersite falls within § 1613(c)(1) as a primary place of business.

■ Appellant admits that the Beaver Falls powerhouse is not its principal place of business under a traditional principal-place-of-business standard. In determining where a company's principal place of business is for federal diversity purposes under 28 U.S.C. § 1332(c)(1), there is no single determinative factor. Instead, "to the extent that there is a general rule ... it is 'that the bulk of corporate activity, as evidenced by the location of daily operating and management activities, governs the choice of a principal place of business.'" *Danjaq, S.A. v. Pathe Communications Corp.,* 979 F.2d 772, 776 (9th Cir. 1992) (quoting Charles A. Wright et al., *Federal Practice and Procedure* § 3635, at 625 (2d ed. 1984 & Supp.1992)). In the instant case, Beaver Falls was one of four electricity-generation facilities owned by KPU that were operating in 1971. The management of KPU, including the management of its electric utility business, was conducted at an office on Front Street in downtown Ketchikan. All customer interactions and general administrative functions were conducted at that office, as well. Of thirty employees who worked solely for the electric business in 1971, only three of them worked at Beaver Falls. The other 27 worked primarily at a warehouse in Ketchikan. Fourteen customer service and administrative employees at the Front Street office worked on the affairs of the electric company as well as KPU's other utilities. The bulk of KPU's corporate activity clearly did not occur at Beaver Falls.

■ Further, our decision would be no different if we were inclined to accept the City's argument that the *principal*-place-of-business test is inapplicable in determining a *primary* place of business under § 1613(c)(1).[2] According to the City, the

---

were formed among the twelve Regional Corporations. The Act authorized the withdrawal of public lands from which the Village and Regional Corporations would select preferred lands. The selected lands would then be conveyed so that the Village Corporation received the surface estate, while the Regional Corporation received the subsurface estate. Congress included provisions to protect certain occupants of ANCSA lands. Those who met the conditions of 43 U.S.C. § 1613(c) would receive a reconveyance in fee of the surface estate of their land. Those who did not meet the conditions, but were legal occupants, could continue their occupancy under 43 U.S.C. § 1613(g).

2. The City argues that Congress used the word "primary" instead of "principal" to indicate that

in making § 1613(c)(1) determinations, courts are not to look to 28 U.S.C. § 1332(c)(1)'s (diversity) criteria. We are not convinced by Appellant's argument that Congress' use of "primary" instead of "principal" indicates that Congress intended to preclude the application of a widely known body of case law to the reconveyance question. Appellant argues that had Congress wanted courts to use the same criteria that are used in diversity questions, it would have clearly stated that intent. The City cites nothing from the legislative history to indicate why Congress used the word "primary" instead of "principal," however, or even to indicate that this was an intentional choice. We find it unlikely that if Congress had wished to announce a whole new standard, and preclude the application of a wide body of case law, it would have done so by

Beaver Falls powerhouse should be found to be a primary place of business because in 1971 55% of all KPU's power was generated at that site.[3] On the other hand, however, KPU also had three other operational plants in 1971. Further, making electricity was just one facet of the utility's operations. The utility also had a vast undertaking in distribution, or transmission, of the electricity, as well as sales. After adding to these other "operational" aspects of the company the administrative and managerial functions previously discussed, we conclude that the Beaver Falls plant did not amount to the electric utility's primary place of business.[4]

## II. *The City is Not Entitled to a Reconveyance Under the Nonprofit Organization Provision of 43 U.S.C. § 1613(c)(2).*

▮ The City also argues that it is entitled to a reconveyance under 43 U.S.C. § 1613(c)(2), which provides:

[T]he Village Corporation shall then convey to the occupant, either without consid-

changing "principal" to "primary," a word that means almost exactly the same thing, without including any explicit instructions.

3. Under § 1613(c)(1), the site had to be a primary place of business on December 18, 1971, in order to qualify for the reconveyance.

4. We also reject the City's argument that in determining whether an occupied site is "a primary place of business" under this section, the proper inquiry is limited to the claimant's presence within the relevant Village Corporation's land. Under the City's proposed reading, a company clearly headquartered in California, for example, could have several "primary place[s] of business"—one in California, one on Cape Fox's land, and one on the lands of each Village Corporation in which it had a presence. We do not believe this is a proper reading of the statute.

The City relies heavily upon *Hakala v. Atxam Corporation*, 753 P.2d 1144 (Alaska 1988). That case does not, however, stand for the proposition that "primary place of business" means "primary place of business within the applicable Village Corporation's lands," as Appellant urges. In *Hakala*, the Alaska Supreme Court held that two hunting guides were entitled to the reconveyance of a plot of land that they used as their base of operations for bear hunting purposes. The Court acknowledged that the guides had other businesses, but rested its decision on the fact that the guides' *bear hunting business* was centered on the disputed land: "Since the cabin was the

eration or upon payment of an amount not in excess of fair market value, determined as of the date of initial occupancy and without regard to any improvements thereon, title to the surface estate in any tract occupied as of December 18, 1971 by a nonprofit organization.

We hold that the City is not entitled to a reconveyance under this provision, either.

The City argues that because its utility is an organization, and it does not make a profit, it is therefore a "nonprofit organization." The City also argues that had Congress meant to exclude municipalities from the term "nonprofit organizations," it could have done so, either expressly, or by using the terms "private" or "corporation" to modify "nonprofit organization." Cape Fox, on the other hand, argues that "nonprofit organization" is a term of art commonly understood to mean private, not governmental, entities.

We agree with Cape Fox's interpretation. First, "nonprofit organization" does have a

nucleus of [their] guiding business, we conclude that it was a primary place of business." *Id.* at 1148. The case did *not* rest, as Appellant suggests, on the fact that the land was the guides' only land within the relevant Village Corporation. Indeed, its language squarely forecloses Appellant's proposed reading: "We find that for each business in which a person engages, there can be only one primary place of business. The primary place of any business is that place which serves as the center of activity for that business." *Id.*

The City also relies heavily on Congress' use of the indefinite article "a" rather than the definite article "the" in § 1613(c):

[T]he Village Corporation shall first convey to any Native or non-Native occupant, without consideration, title to the surface estate in the tract occupied as of December 18, 1971 ... as *a* primary place of residence, or as *a* primary place of business, or as *a* subsistence campsite, or as headquarters for reindeer husbandry....

*Id.* (emphasis added). We believe that Appellant attaches too much significance to the word "a." Given that there is a grammatical explanation for the use of the word (the sentence simply reads better than if "the" had been used); and that there is no indication that Congress meant for the word to have such significance (allowing a company to have several primary places of business, rather than one), we do not believe that the word can carry the load that Appellant wishes to place upon it.

758

commonly understood meaning, which does not include municipalities. Rather, the term refers to private groups such as the Red Cross, Big Brothers/Big Sisters, etc. Second, several federal statutes demonstrate that Congress, in particular, treats nonprofit organizations separately from municipalities. *See, e.g.,* 12 U.S.C. § 1831q(c); 43 U.S.C. § 485h(c). Third, when Congress has wanted to include municipalities within nonprofit organizations, it has done so explicitly. *See, e.g.,* 42 U.S.C. § 8143.

The structure of ANCSA also supports Cape Fox's interpretation. Section 1613(c)(2) provides for "nonprofit organizations." The very next subsection expressly provides for municipalities. This strongly indicates that Congress meant to treat municipalities and nonprofit organizations separately. With this structure in mind, we believe that if Congress had wanted to include municipalities within its nonprofit organization provision, it would have done so explicitly.[5] Accordingly, the City cannot turn to 1613(c)(2)'s nonprofit provision for a reconveyance.

## CONCLUSION

For the foregoing reasons, we affirm the summary judgment in favor of Cape Fox.

---

**5.** The City also argues that a nonprofit electric utility cooperative that was not connected to a municipality would be entitled to a reconveyance under subsection (c)(2), and thus that the City's utility should not be punished simply for having municipal ties. It is not clear that the City is correct, however, that a nonprofit cooperative utility would be entitled to a 1613(c)(2) reconveyance. It may be that when nonprofits run businesses, they only are entitled to reconveyances of those business properties where the properties are the primary places of the businesses, under subsection (c)(1). Moreover, even if the City were correct, we would not find the result problematic. Congress has specifically delineated the rights of both nonprofits and municipal corporations. If the posited private nonprofit utility were to meet the applicable requirements of subsection (c)(2), more power to it. If the municipal utility were to meet the requirements under subsection (c)(3), on the other hand, more power to it. Holding the two entities to different standards is not problematic—it is required by the statute. There are obvious differences between municipal corporations and private nonprofit organizations. We see no reason why Congress cannot treat them differently.