**CITY OF KETCHIKAN, a municipal corporation, d/b/a Ketchikan Public Utilities, Plaintiff–Appellant,**

v.

**CAPE FOX CORPORATION, an Alaska corporation, Defendant–Appellee.**

No. 94–35316.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 10, 1995.

Opinion Filed Sept. 6, 1995.

Opinion Withdrawn Jan. 23, 1996.

Resubmitted April 25, 1996.

Decided May 23, 1996.

H. Clay Keene, Keene & Currall, Ketchikan, Alaska, for plaintiff-appellant.

James D. Nelson, Betts, Patterson & Mines, Seattle, Washington, for defendant-appellee.

Before: WRIGHT, POOLE and WIGGINS, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

This case involves interpretation of the land reconveyance provision of the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1613(c). The City of Ketchikan seeks conveyance from the Cape Fox Corporation of surface title to 38 acres upon which its Beaver Falls hydroelectric powerhouse is located. The City appeals the district court's grant of summary judgment to Cape Fox. Upon de novo review, *Jesinger v. Nevada Fed. Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994), we affirm.

## BACKGROUND

Congress enacted ANCSA in 1971. The Act is a legislative compromise, written in response to conflicts among the federal government, the state of Alaska, Alaska Natives and non-Native settlers over ownership of Alaskan lands. It awarded Alaska Natives $962.5 million and approximately 40 million acres of public land, in exchange for extinguishment of their aboriginal title claims. *See* 43 U.S.C. §§ 1603, 1605(a), 1611.

The Act divides Alaska into 12 geographic regions, each with a Native Regional Corporation. 43 U.S.C. § 1606(a). Within the Regional Corporations are approximately 200 Village Corporations. 43 U.S.C. § 1607. Subject to certain restrictions, the Village and Regional Corporations were allowed to select land in "contiguous and ... reasonably compact tracts" from the available public lands in Alaska. 43 U.S.C. § 1611(c)(2). The Village Corporations received title to the surface estate, and the Regional Corporations received the subsurface estate. 43 U.S.C. § 1613(f). The Village Corporations are required to reconvey, without consideration, the surface title to Native or non-Native "occupants" who meet certain conditions. 43 U.S.C. § 1613(c). Those legal occupants who do not meet the conditions may continue their occupancy, but do not receive title. 43 U.S.C. § 1613(g).

The City of Ketchikan operates electric, water and telecommunications utilities under the name Ketchikan Public Utilities (KPU). As part of its electric utility, it runs the Beaver Falls hydroelectric powerhouse, which is located six and a half miles from Ketchikan. The City constructed the facility in 1945 on public lands within the Tongass National Forest and has since operated it pursuant to a 50–year license from the Federal Power Commission. The lease and license expired at the end of 1995. The City has obtained a new 30–year license subject to its ability to secure the right to use the land. *See Ketchikan Public Utilities,* 69 Fed. Energy Reg. Comm'n ¶ 62,113 (1994), *as modified by,* 74 Fed. Energy Reg. Comm'n ¶ 61,-051 (1996). The City has never owned the land.

In 1984, Cape Fox, a Native Village Corporation, acquired surface title to 428 acres of federal land pursuant to ANCSA. The Beaver Falls powerhouse is situated upon approximately 38 acres of that land. The City of Ketchikan seeks surface title pursuant to two ANCSA conveyance subsections. It argues that the Beaver Falls site is a primary place of its electric utility business pursuant to subsection 1613(c)(1), and that the City is entitled to the land as a nonprofit organization under subsection (c)(2). The district court granted Cape Fox's motion for summary judgment, finding neither conveyance provision applicable. The City appealed.

## DISCUSSION

### I. *"Primary Place of Business": § 1613(c)(1)*

The City first argues that it is entitled to title to the disputed site under subsection 1613(c)(1), which provides:

> the Village Corporation shall first convey to any Native or non-Native occupant, without consideration, title to the surface estate in the tract occupied as of December 18, 1971 ... as a primary place of residence, or as *a primary place of business,* or as a subsistence campsite, or as headquarters for reindeer husbandry....

(emphasis added).

■ The City's argument depends on whether the power plant could be considered "a primary place of business" on December 18, 1971. Congress has not used this exact term in any other statute, and the legislative history provides no guidance as to its definition. Only one opinion has considered its meaning. *See Hakala v. Atxam Corp.,* 753

P.2d 1144 (Alaska 1988). Thus we look to the statute's plain language. *In re Hanna,* 72 F.3d 114, 115 (9th Cir.1995).

■ The City argues that by using the article "a" rather than "the," Congress indicated that a business can have more than one primary place. We disagree. Despite the use of "a," the word "primary" connotes a single leading location. *See* Black's Law Dictionary 1071 (5th ed.1979) (primary means "First; principal; chief; leading. First in order of time, or development, or intention."); Webster's New World Dictionary 1129 (2d ed.1974) (primary means "first in time or order of development; primitive; original; earliest ... first in importance; chief; principal; main"). Because we believe that the focus of the phrase is the word "primary," we hold that a business may have only one "primary place." To read the statute otherwise would change the meaning of "primary" to merely "significant."

■ Although a business may have only one primary location, a person or corporation may have more than one business. *Accord Hakala,* 753 P.2d at 1148 ("We find that for *each business* in which a person engages, there can only be one primary place of business.") (emphasis added). The City argues that KPU encompasses three distinct businesses: an electric utility, a telecommunications utility and a water utility. For purposes of this opinion only, we agree that these utilities should be considered separate businesses and that each may have its own primary place of business.[1] Thus we must decide whether the electric utility's primary place of business is the Beaver Falls plant or its downtown Ketchikan office.[2]

■ In defining "primary place of business," Cape Fox urges us to look to the definition of the "principal place of business" used in personal jurisdiction analyses. *See* 28 U.S.C. § 1332(c)(1) ("[A] corporation shall

be deemed to be a citizen ... of the State where it has its principal place of business"); *Danjaq, S.A. v. Pathe Communications Corp.,* 979 F.2d 772, 776 (9th Cir.1992) ("[T]he bulk of corporate activity, as evidenced by the location of daily operating and management activities, governs the choice of a principal place of business."). The City concedes that under that analysis the powerplant is not its primary place of business.

Although the jurisdiction cases provide some guidance, we do not believe that that analysis is determinative. In ANCSA, Congress chose to use language similar to section 1332(c), but not identical. *See BFP v. Resolution Trust Corp.,* —— U.S. ——, ——, 114 S.Ct. 1757, 1761, 128 L.Ed.2d 556 (1994) (holding that the neologism "reasonably equivalent value" does not necessarily carry the same meaning as traditional "fair market value"). Moreover, the policy concerns behind the jurisdictional definition are inapt in the ANCSA context. The underlying purpose of diversity jurisdiction is to protect out-of-state corporations from local prejudices. *See Danjaq,* 979 F.2d at 774; S.Rep. No. 1830, 85th Cong., 2d Sess. 4 (1958). This reasoning bears no relation to Alaskan land selection.

■ The Alaska Supreme Court's decision in *Hakala,* although not binding on this court, provides a better analysis. That court recognized that Congress wanted to protect existing businesses, as well as to help Native Alaskans. With that in mind, the court "adopt[ed] an interpretation of the phrase 'a primary place of business' which effectuate[d] Congress' intent to protect a wide array of existing legitimate businesses." *Id.* Refusing to create "rigid and arbitrary requirements," the court interpreted "primary place of business" as the "place which serves as the center of activity for that business." *Id.*[3] We adopt the *Hakala* court's description of the test.

---

1. Obviously if we were to consider the entire City of Ketchikan or even KPU as a whole, the City would easily fail the "primary place" test. It would be absurd to find that the remote powerplant was a primary place of business for all of Ketchikan or its utilities.

2. The City further argues that because its business "is to produce power," we should not consider the electric utility's administrative and distribution activities. The City's argument goes too far.

3. The City argues that "the inquiry [into the primary place of business] must determine which

With this test in mind, we hold that the downtown office was the "nucleus" and "center" of KPU's electric business activity in 1971. Although Beaver Falls generated 55% of KPU's power, the location was but one of four electricity-generating facilities owned by the City. The management of KPU, including the management of its electric utility business, was conducted at an office in downtown Ketchikan. All customer interactions and general administrative functions were conducted at that office. Of the 30 employees who worked solely for the electric utility in 1971, only three worked at Beaver Falls. The utility also had a vast undertaking in electricity distribution and sales that did not take place at Beaver Falls. We conclude that the Beaver Falls plant was not the electric utility's primary place of business.[4]

## II. *"Nonprofit Organization": § 1613(c)(2)*

The City also argues that it is entitled to a reconveyance as a "nonprofit organization" based on the plain language of subsection 1613(c)(2). It provides:

> [T]he Village Corporation shall then convey to the occupant ... title to the surface estate in any tract occupied as of December 18, 1971 by a *nonprofit organization.* (emphasis added).

The City argues that because KPU does not make a profit and is an organization, it is a "nonprofit organization" under subsection 1613(c)(2). We disagree.

When we construe statutory language we look first to its plain meaning, *In re Hanna,* 72 F.3d at 115, but our inquiry does not stop there. "When we look to the plain language of a statute in order to interpret its meaning, we do more than view words of subsections in isolation. We derive meaning from context, and this requires reading the relevant statutory provisions as a whole." *In re Rufener Constr., Inc.,* 53 F.3d 1064, 1067 (9th Cir.1995). We note that any ambiguity in a statute must be interpreted liberally in favor of the Native tribes. *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985); *Tyonek Native Corp. v. Secretary of the Interior,* 836 F.2d 1237, 1239 (9th Cir. 1988).

The structure of section 1613(c) is important to our analysis. This section awards specific conveyances to a limited group of occupants. Subsection (a), discussed earlier, conveys land to four groups: occupants who have a primary residence, a primary place of business, a subsistence campsite or reindeer husbandry headquarters. Subsection (b) conveys land to nonprofit organizations. Subsections (c) and (d) involve conveyances to Native and non-Native municipal corporations.[5] The City argues that it fits the definitions of both nonprofit organization and municipal corpo-

---

location (or locations) of a business that exist *within village corporation land* is its primary or most significant location. Since the City's Beaver Falls hydroelectric site was the City's only location within Cape Fox's ANCSA land, that location was the utility's primary place of business for purposes of section 1613(c)(1)." (emphasis added). We disagree. Nowhere in ANCSA or in *Hakala* is the "primary place of business" limited in such a way. Even if *Hakala* could be construed in such a manner, that reasoning would not be binding on this court. We further note that the City did not adequately raise this argument before the district court.

4. As the district court noted, "if the City's logic is used, the primary place of business of Wonder Bread would be the wheat fields of Kansas." Similarly, the primary place of business of Shell Oil would be under the floor of the Pacific Ocean.

5. 43 U.S.C. § 1613(c):

(3) the Village Corporation shall then convey to any Municipal Corporation in the Native village or to the State in trust for any Municipal Corporation established in the Native village in the future, title to the remaining surface estate of the improved land on which the Native village is located and as much additional land as is necessary for community expansion, and appropriate rights-of-way for public use, and other foreseeable community needs....
(4) the Village Corporation shall convey to the Federal Government, State, or to the appropriate Municipal Corporation, title to the surface estate for airport sites, airway beacons, and other navigation aids as such existed on December 18, 1971, together with such additional acreage and/or easements as are necessary to provide related governmental services and to insure safe approaches to airport runways as such airport sites, runways, and other facilities existed as of December 18, 1971....

ration, and should receive the benefits of both conveyance provisions. There are several problems with its argument.

First, the City's argument makes subsections (3) and (4) superfluous. *Security Pacific Nat'l Bank v. Resolution Trust Corp.,* 63 F.3d 900, 904 (9th Cir.1995) ("We must avoid a construction which renders any language of the enactment superfluous."). By the City's reasoning, a municipal corporation, as a nonprofit organization, would receive a conveyance of all occupied lands pursuant to subsection 1613(c)(2). Thus, subsection (3), which requires conveyance to municipal corporations in Native villages of all improved land on which the village is located, would be unnecessary because under subsection (2) the municipal corporation would already have received the conveyance. Similarly, subsection (4), which awards the government any airstrips, airport sites and the like, would also be unnecessary.

Second, Congress did not define "nonprofit organization" in ANCSA but it did define "municipal corporation." A municipal corporation is "any general unit of municipal government under the laws of the State of Alaska." 43 U.S.C. § 1602(i). The City of Ketchikan, which operates KPU, is organized under Alaska law as a municipal corporation. *See* Alaska Stat. § 29.71.800(13) (defining it as "a political subdivision incorporated under the laws of [Alaska] that is a home rule or general law city, a home rule or general law borough, or a unified municipality."). Neither the City nor the utility is organized under Alaska statutes for nonprofit organizations. *See* Alaska Stat. § 10.20. It seems logical that Congress would look to state law for both definitions. If so, the City is a municipal corporation and not a nonprofit organization. The City owns, runs and controls KPU. According to the City, it "owns" the Beaver Falls facility. It is the City that brought this action (*see* caption "City of Ketchikan, a municipal corporation, d/b/a Ketchikan Public Utilities") and it is the City holding the license to run the Beaver Falls powerhouse. For purposes of ANCSA, the City (and thus KPU) is a municipal corporation, and not a "nonprofit organization."

Third, even if the City were considered to be both a municipal corporation and a nonprofit organization, the municipal corporation's more specific provisions must prevail. *Security Pacific,* 63 F.3d at 904. In this type of case, the more specific provisions (subsections (3) and (4), which grant limited conveyances to municipal corporations) become an exception to the general rule (subsection (2), which grants conveyance to nonprofits of all occupied lands). *See id.* (citing 2A *Sutherland Stat. Constr.* § 47.17).

We conclude that the City of Ketchikan, doing business as Ketchikan Public Utilities, does not qualify for a reconveyance as a nonprofit organization under ANCSA.

## CONCLUSION

The City of Ketchikan ultimately fails in its effort to win surface title to the 38 acres upon which its Beaver Falls facility is located. This result is not inequitable. The City has been afforded many protections and benefits under ANCSA. Every Alaska city received a two-mile "buffer zone" around its boundary in which the Native villages could not select any land. 43 U.S.C. § 1621(*l*). The City of Ketchikan was the only municipal corporation in all of Alaska to secure a six-mile buffer zone. *Id.* It is also protected by the reconveyance provisions of subsection 1613(c)(4), which ensures land for airstrips and the like. And the City's license with the federal government was protected by subsection 1613(g), which allowed the City to continue operating its power plant unchanged for the past 10 years, even though the land's ownership changed hands.

Finally, we note that the City has never owned this land but only leased it from the federal government. When its lease expired the City would have been forced to renegotiate with whoever then owned the land. There was no guarantee that the government would retain ownership in perpetuity. As the Federal Energy Regulatory Commission recently noted

Ketchikan will have to make the necessary arrangements with Cape Fox for the land use rights it needs for the [hydroelectric] project.... The financial interest in the land now rests with Cape Fox, not the

United States. At the same time, Ketchi-kan will have access, permitting it to con-tinue to operate its project, so long as it is prepared to reasonably compensate Cape Fox for the land involved.

Ketchikan Public Utilities, 74 FERC at 13, 15.

We AFFIRM the summary judgment in favor of Cape Fox.