**John S. SWISS, individually and d/b/a Swiss's Alaska Trophy Hunts, Appellant,**

v.

**CHIGNIK RIVER LIMITED, an Alaska corporation, Appellee.**

No. S–7726.

Supreme Court of Alaska.

Jan. 2, 1998.

Thomas E. Meacham, Anchorage, for Appellant.

Amy L. Vaudreuil, Hedland, Brennan, Heideman & Cooke, Anchorage, for Appellee.

Before COMPTON, C.J., and MATTHEWS and BRYNER, JJ.

*OPINION*

MATTHEWS, Justice.

## I. INTRODUCTION

The Alaska Native Claims Settlement Act (ANCSA) requires village corporations to convey land used as a subsistence campsite to the occupant. The question presented is whether an occupant may be entitled to more than one campsite for a given subsistence use. We answer "yes" because the act contains no limitations pertaining to subsistence campsites and multiple campsites are frequently needed for the subsistence lifestyle which Congress meant to protect.

## II. FACTS AND PROCEEDINGS

John Swiss is a big game guide and subsistence hunter and fisherman. In 1949 he and his family began setnet fishing at Polly Creek; in 1951 he opened a commercial big game guiding business. Swiss set up permanent hunting camps in several places around the state. One of these was at Black Lake, the site at issue in this case. In 1967 Swiss built a cabin at the site. This camp has been used as a place out of which hunters were guided and for obtaining meat for personal use from moose, caribou and ptarmigan.

Pursuant to section 14(a) of ANCSA, 43 U.S.C. § 1613(a), Chignik River Limited (Chignik) selected and received title to large blocks of federal land including the land on which the Black Lake camp stands. Section 14(c)(1) of ANCSA, 43 U.S.C. § 1613(c)(1), requires village corporations to convey to "any Native or non-Native occupant" title to the surface estate of tracts of land obtained under section 14(a) used, as of December 18, 1971, "as a primary place of residence, or as a primary place of business, or as a subsistence campsite, or as headquarters for reindeer husbandry." *Id.*

Swiss has received a conveyance of a primary place of business site. This was his guiding campsite at Cathedral Creek. He has also had a tract near Fan Creek con-

veyed to him as a subsistence campsite. In this case, Swiss ultimately came to claim that he was entitled to conveyance of the Black Lake camp as another subsistence campsite.[1]

When Chignik failed to take action on Swiss's application for a conveyance he filed suit. On cross motions for summary judgment, the superior court ruled that Swiss was not entitled to the Black Lake parcel as a subsistence campsite because he had already received a conveyance of the Fan Creek subsistence campsite and he claimed both sites for the same subsistence use— gathering meat. The court also awarded Chignik Civil Rule 82 attorney's fees of $6,891.60 and costs of $1,383.80.

Swiss appeals, claiming that an occupant is not limited to a conveyance of a single subsistence campsite for a particular subsistence use under section 14(c)(1). Chignik argues that the superior court was correct in its reasoning regarding the number of subsistence campsites to which an occupant is entitled and, in the alternative, that Swiss did not use the Black Lake camp as a subsistence campsite but as a commercial camp and that the conveyance should be denied on that ground.

## III. *DISCUSSION*

### A. *Conveyance Under Section 14(c)(1).*

ANCSA section 14(c)(1), 43 U.S.C. § 1613(c)(1), provides:

> Each patent issued [to a village corporation under section 14(a) and (b) of the act] shall be subject to the requirements of this subsection. Upon receipt of a patent or patents:
>
>> (1) the Village Corporation shall first convey to any Native or non-Native occupant, without consideration, title to the surface estate in the tract occupied as of December 18, 1971 ... as a primary place of residence, or as a primary

place of business, or as a subsistence campsite, or as headquarters for reindeer husbandry[.]

In *Hakala v. Atxam Corporation,* 753 P.2d 1144 (Alaska 1988), we interpreted the "primary place of business" provision of section 14(c)(1) to mean that "for each business in which a person engages, there can be only *one* primary place of business." *Id.* at 1148. Thus, an occupant is entitled to conveyance of only one parcel of land as a primary place of business for a given business.

In this case, the superior court reasoned that the statutory limitation placed on the conveyance of a "primary place of business" should also be read into the clause providing for conveyance of a subsistence campsite. The court wrote:

> The language of Sec. 14(c)(1) limits conveyances of businesses and residences to the *primary* business and residence site and conveyances of reindeer husbandry sites to the *headquarters* for such activities. That indicates that even though long time users of the land had secondary business sites, residences, and reindeer husbandry sites, they are not entitled to a Sec. 14(c)(1) conveyance for those sites. By the same token, the conveyance of one subsistence campsite for a particular subsistence purpose should act to bar the conveyance of additional subsistence sites used for the same purpose.

Thus, under the reasoning employed by the superior court, one could obtain conveyances of a game subsistence campsite and a berry picking subsistence campsite but not two game subsistence campsites. As Swiss had claimed his Fan Creek and Black Lake camps as game subsistence sites, and had obtained a conveyance of the former, the superior court concluded he was not entitled to the latter.

**1.** Swiss initially litigated the case as a claim for another primary place of business site. It became clear that this claim would not prevail because of this court's ruling in *Hakala v. Atxam Corp.,* 753 P.2d 1144 (Alaska 1988). There, we held that a person could only have one primary place of business for a given business for purposes of section 14(c)(1). *Id.* at 1148. Swiss had claimed both the Cathedral Creek site and the Black Lake camp as primary places of business for his guiding operations. However, in his initial application to Chignik for conveyance, he had also claimed that the Black Lake camp was a subsistence campsite used to gather meat for his family. Swiss amended his complaint to claim the Black Lake camp as a subsistence campsite.

B. *Does Section 14(c)(1) Limit Convey-
ance of Subsistence Campsites to One
Campsite Per Subsistence Use?*

■ Swiss argues that our *Hakala* deci-
sion provides the key to the outcome of this
case. He notes that "in contrast to the 'pri-
mary' place of business requirement and the
'primary' place of residence requirement in
Section 14(c)(1), the 'subsistence campsite'
category is not so qualified." He concludes,

> given this Court's holding in *Hakala* that a
> "primary" place of business can only be a
> single site, the fact that Congress did not
> similarly qualify subsistence campsite
> claims should have led the court below to
> the opposite conclusion: that Congress, by
> not imposing the "primary" qualifier on
> subsistence campsites (as it had done for
> places of business and places of residence),
> explicitly did not intend to limit a claimant
> to only one subsistence campsite.

Chignik argues in opposition that Swiss's
interpretation of the act would cause too
much ANCSA land to be conveyed out of the
hands of village corporations.

In our view, Swiss has the better of the
argument. Section 14(c)(1) does not impose
an express limitation on the number of sub-
sistence campsites as it does for residences
and businesses. This omission implies that
no limitation was intended. *See Croft v. Pan
Alaska Trucking, Inc.,* 820 P.2d 1064, 1066
(Alaska 1991) (designating certain things in a
statute indicates that omissions should be
understood as exclusions); *Burrell v. Bur-
rell,* 696 P.2d 157, 165 (Alaska 1984) ("It is an
accepted rule of statutory construction that
to include specific terms presumptively ex-
cludes those which are not enumerated.").

Furthermore, practical considerations also
indicate that a rule of one game campsite per
occupant was not intended. Many Alaskan
Natives leading a traditional subsistence life-
style rely on more than one species for meat.
Each species may be harvested in a different
location, thus requiring several subsistence
campsites. Further, some species are migra-
tory and pursuing them requires more than
one campsite. Imposing a single-campsite
limit for taking game would ignore these
realities.

The influential report of the Federal Field
Committee for Development Planning in
Alaska, *Alaska Natives & the Land* (1968),
submitted to Congress as background for
ANCSA, recognized these facts and the con-
sequent need for multiple campsites:

> Alaska is often pictured as a hunter's
> paradise. No vision could be more mis-
> leading. True, there are areas where wild-
> life abounds. There are other areas, some
> as large as most states, where few or no
> game animals exist. A case in point is the
> northern caribou that wander over the
> Arctic tundra, inhabiting one area for a
> few months then migrating to another.
> Oftentimes they are found hundreds of
> miles from where they were at the same
> time in previous years. Sometimes they
> avoid using a part of their range or migrat-
> ing route for years. Other large areas
> such as the Yukon–Kuskokwim deltas sup-
> port only waterfowl and small furbearers.
> Much the same may be said for the Aleu-
> tian Islands. It is only when discussing
> southern and interior Alaska that we can
> deal in terms of biological populations ex-
> isting permanently in the same location.
> And even these are subject to the cyclic
> fluctuations common to most forms of wild-
> life.
>
> To a human population depending upon
> these resources for survival, this meant
> adoption of a way of life that would enable
> them to obtain food, clothing and shelter at
> all times of the year. Most imperative was
> continual contact with their food supply.
> It also meant a human population density
> at a level commensurate with the natural
> productivity of the land and the waters.
> That the Native people were able to devise
> means of covering long distances in search
> of food, for living in the open for long
> periods of time, of traveling over moving
> sea ice, and means of preserving their food
> during that part of the year when the
> temperature was above freezing is proof of
> their resourcefulness and energy.

*Id.* at 91.

> Grants of fishing, hunting, and food-
> gathering sites may be made to individuals
> now using them or to Native groups for
> later transfer to the individuals in posses-

sion. Since agencies do not have knowledge of the locations of all such camps nor their users, the most practical approach is to have government teams meet with villages in the field to obtain applications from villagers for the sites they use. Even residents of the largest villages continue to use historic sites for hunting, fishing, and trapping—sometimes for longer periods than they reside in what may be called their home villages.

Congress might impose a maximum number of subsistence-use sites and a maximum acreage that might be embraced by all applications from each head of a household or other adult, but in so doing it should be remembered that the number of subsistence sites required for each family in their subsistence quest varies throughout the state.

While the 160–acre limitation of the Alaska Native Allotment Act might be adequate, the limitation to only four parcels would not cover the number of sites now in use by many families.

*Id.* at 539.

Based on the structure of section 14(c) and the nature of the subsistence hunting practices which Congress sought to protect, we conclude that the superior court erred in holding that an occupant is entitled to conveyance of only one subsistence campsite for subsistence game under section 14(c)(1).

### C. Did Swiss Use the Black Lake Camp as a Subsistence Campsite?

Chignik contends that the superior court's grant of summary judgment should be upheld on the alternate ground that Swiss used the Black Lake site primarily for business and only incidentally as a subsistence campsite and that he is not entitled to conveyance of the site under section 14(c)(1). We decline to make such a determination on the record before us.

No standard has been set to determine whether a site which is used for subsistence and for another purpose qualifies as a subsistence campsite under ANCSA. Chignik suggests that the decision should turn on the "predominant character" of the use of the site. Swiss suggests that qualifying subsistence usage need only be "not inconsequential" or, alternatively and more restrictively, "substantial." Other standards are also conceivable. The question as to what the applicable standard should be was not litigated in the superior court, and has not been brought into focus in the parties' briefs before this court. Therefore, we do not believe that it would be appropriate to decide at this time what the standard should be. On remand, the superior court should invite additional briefing, decide on the appropriate standard, find the facts, and apply them to the standard.

### D. Attorney's Fees and Costs.

We reverse the superior court's award of attorney's fees and costs to Chignik because the award is not now appropriate given our reversal of the underlying decision.

### IV. CONCLUSION

For the reasons stated, we REVERSE the judgment of the superior court and REMAND for further proceedings in light of this opinion.

EASTAUGH and FABE, JJ., not participating.